Matthew E. Lewitz (SBN 325379)
  mlewitz@cozen.com
COZEN O'CONNOR
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
T: (213) 892-7937
F: (310) 394-4700

Michael A. Fernández (*Pro Hac Vice*)
  mfernandez@cozen.com
COZEN O'CONNOR
3 WTC, 175 Greenwich Street 55th Floor
New York, NY 10017
T: (212) 453-3713
F: (646) 461-2075

Attorneys for Non-Party
X Corp. Account Holders,
John Doe 1 a.k.a @FreddyOliviery;
John Doe 2 a.k.a. @PonchoGutz;
Meta Account Holders,
John Doe 3 a.k.a. "Luis Guillermo Hernández";
John Doe 4 a.k.a. "Hans Salazar"; and
Google LLC Account Holder,
John Doe 5 a.k.a. "SinCensuraTVMedia"

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re* Application of BANCO AZTECA S.A. INSTITUCIÓN DE BANCA MÚLTIPLE, for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | Case 5:24-mc-80091-NC<br><br>**DECLARATION OF MICHAEL A. FERNÁNDEZ IN SUPPORT OF NON-PARTY X, META AND GOOGLE ACCOUNT HOLDERS' MOTION TO QUASH AND/OR FOR PROTECTIVE ORDER** |

I, Michael A. Fernández, declare under the penalty of perjury:

1.     I am an attorney licensed to practice law in the State of New York and admitted to practice before this Court *pro hac vice*, and am a member with the law firm of Cozen O'Connor,

counsel for Non-Party X Corp., Meta and Google LLC Account Holders, John Does 1-5, in this matter (the "Non-Party Movants" or "Affected Account Holders").

2.      I make this Declaration in support of the Non-Party Movants' Motion to Quash and/or for Protective Order.

3.      I am over the age of 18, and have personal knowledge of the facts contained herein, except where stated upon information and belief, which facts I believe to be true, and, if called as a witness in this proceeding, could and would competently testify thereto.

4.      On July 28, 2024, I emailed counsel for Applicant Banco Azteca, S.A. Institución de Banca Múltiple ("Banco Azteca"), along with counsel for all of the interested social media platforms, inquiring whether the parties would consent to or at least agree to not oppose a motion for an extension of time by the Affected Account Holders to respond to *Banco Azteca's Notice of Application and Ex Parte Application for an Order Pursuant to 28 U.S.C. §1782 Authorizing Discovery for Use in a Foreign proceeding*. (ECF No. 1.)  Mike Hurvitz at the law firm of Nelson Mullins Riley & Scarborough LLP ("NMRS"), counsel of record to Banco Azteca, responded to my email, asking to know which "affected account holders" I represent "and on which platform(s)?"  I subsequently responded specifying the usernames of the Affected Account Holders. To my surprise, Mr. Hurvitz responded by stating that "you have not disclosed the identities of your clients." I then responded by noting that the practice in the Northern District of California has been for social media users to appear in similar cases without disclosing their identity. A true and correct copy of my above-described email exchange withBanco Azteca's attorneys  is attached as **Exhibit ("Ex.") A.**

5.      Since August 13, 2024, I have requested on multiple occasions a copy of the criminal complaint that was purportedly filed by Banco Azteca in the State of Jalisco, Mexico. True and correct copies of the email exchange between Banco Azteca's attorneys and myself wherein I made such requests are attached as **Exs. B-D.**

6.      On August 13, 2024, I emailed Banco Azteca's counsel noting that "[e]xtensive

2

DECLARATION OF MICHAEL A. FERNÁNDEZ IN SUPPORT OF
NON-PARTY X, META AND GOOGLE ACCOUNT HOLDERS'S
MOTION TO QUASH AND/OR FOR PROTECTIVE ORDER
CASE 5:24-mc-80091-NC

reference is made in Banco Azteca's 1782 Application to 'a criminal complaint, which was registered under investigation folder number 5101/202254 of Agency 4 of Bulk Processing of the Public Prosecutor's Office of the State of Jalisco' filed on January 19, 2024." (**Ex. B**.) I then inquired whether Banco Azteca would "provide the parties with the alleged criminal complaint as well as the subsequent filings." (**Id.**)

7.     On August 14, 2024, I received a response from Mr. Hurvitz simply stating that "We are not able to provide you with the criminal complaint and/or subsequent filings." (**Id.**)

8.     After some additional follow-up over e-mail, I had a conversation with John Veysey at the law firm of NMRS on August 19, 2024 in which, among other things, we discussed the basis for Banco Azteca's decision to withhold the criminal complaint. (**Id.**)

9.     Following the August 19, 2024 conversation, I sent an email to NMRS raising concerns about the filing of a criminal proceeding against the Affected Account Holders in Jalisco, Mexico. **Id.** In that connection, I referenced the following articles:

a.   Simon Schatzberg, *Jalisco identified as a 'red flag' for judicial corruption*, MEXICO NEWS DAILY, May 16, 2019. A true and correct PDF print-out of the article is attached as **Ex. E.**

b.   Fernando Pérez-Lozada, *Denial of Justice by Mexican Courts to Canadian Investment Fund under NAFTA: the First of its Kind*, Kluwer Arbitration Blog, Oct. 30, 2021. A true and correct PDF of the article is attached as **Ex. F.**

10.     In a response explaining why Banco Azteca was unwilling to share the criminal complaint, Mr. Veysey stated on August 20, 2024  that "[w]e understand the authorities in Mexico have an ongoing investigation. For obvious reasons, my team is not involved in that investigation. We are not prepared to collect and share information with your clients about that investigation, and we will not do so." (**Ex. C.**)

11.     Subsequently, there have been further exchanges between the parties as to whether Banco Azteca would provide additional information about the criminal matter purportedly pending

DECLARATION OF MICHAEL A. FERNÁNDEZ IN SUPPORT OF
NON-PARTY X, META AND GOOGLE ACCOUNT HOLDERS'S
MOTION TO QUASH AND/OR FOR PROTECTIVE ORDER
CASE 5:24-mc-80091-NC

in Mexico. (*E.g.*, **Exs. C-D**.)

12. On September 11, 2024, I sent an email inquiring whether NMRS has "at a minimum, confirmed whether the accounts of John Does 1-5 for which Banco Azteca is seeking information actually are referenced/named in the criminal complaint in Mexico?" (**Ex. E.**) In my e-mail, I also asked Banco Azteca to provide clarification regarding its statement that "has commenced a civil action against certain individuals." (***Id.***) To date, Banco Azteca has not responded to this email or shared a copy of any documents filed in connection with the criminal proceeding referenced in *Banco Azteca's Amended Notice of Application and Amended Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding*, ECF No. 39.

13. For the Court's convenience, I am attaching as exhibits to this declaration several articles referenced in the Non-Party Movants' Memorandum of Points and Authorities:

    **a.** Santiago Pérez, *Mexican Tycoon's Retail Chain Ordered to Pay $1 Billion in Back Taxes,* Wall St. J., June 13, 2024. A true and correct PDF print-out of the article is attached as **Ex. G.**

    **b.** José de Córdoba and Santiago Pérez, *Combative Billionaire's Bank Accused of Bribing a Texas Democrat*, Wall St. J., May 8, 2024. A true and correct PDF print-out of the article is attached as **Ex. H.**

    **c.** *Fitch Downgrades Banco Azteca's IDRs to 'BB-'; Outlook Stable*, Fitch Ratings, Mar. 24, 2024. A true and correct PDF print-out of the article is attached as **Ex. I.**

    **d.** *Internet Freedom and Technology and Human Rights*, U.S. Dep't of State. A true and correct PDF print-out of the webpage created on September 16, 2024 is attached as **Ex. J.**

    **e.** Hon. Hillary Rodham Clinton, Remarks on Internet Freedom, U.S. Dep't of State (Jan 21. 2020). A true and correct PDF print-out of the speech is attached as **Ex. K.**

4

DECLARATION OF MICHAEL A. FERNÁNDEZ IN SUPPORT OF
NON-PARTY X, META AND GOOGLE ACCOUNT HOLDERS'S
MOTION TO QUASH AND/OR FOR PROTECTIVE ORDER
CASE 5:24-mc-80091-NC

I declare under penalty of perjury under the laws of the States of New York and California, and the United States of America, that the foregoing is true and correct.

Executed on this 17th day of September, 2024, at New York, New York.


DATED: September 17, 2024                    Respectfully submitted,

                                   By:    /s/ Michael A. Fernández

                                          Michael A. Fernández (*Pro Hac Vice*)
                                          mfernandez@cozen.com
                                          COZEN O'CONNOR
                                          3 WTC, 175 Greenwich Street
                                          55th Floor
                                          New York, NY 10017
                                          T: (212) 453-3713
                                          F: (646) 461-2075

                                          *Attorneys for Non-Party*
                                          *X Account Holders,*
                                          *John Doe 1 a.k.a @FreddyOliviery;*
                                          *John Doe 2 a.ka. @PonchoGutz;*
                                          *Meta Account Holders,*
                                          *John Doe 3 a.k.a. "Luis Guillermo*
                                          *Hernández";*
                                          *John Doe 4 a.k.a. "Hans Salazar"; and*
                                          *Google LLC Account Holder,*
                                          *John Doe 5 a.k.a. "SinCensuraTVMedia"*

DECLARATION OF MICHAEL A. FERNÁNDEZ IN SUPPORT OF
NON-PARTY X, META AND GOOGLE ACCOUNT HOLDERS'S
MOTION TO QUASH AND/OR FOR PROTECTIVE ORDER
CASE 5:24-mc-80091-NC

# EXHIBIT A

## Fernandez, Michael

| | |
|---|---|
| **From:** | Fernandez, Michael |
| **Sent:** | Monday, August 5, 2024 4:07 PM |
| **To:** | Mike Hurvitz; Hawk, Jon; Schwartz, Julie (Perkins Coie) |
| **Cc:** | de Leeuw, Michael; Mark Raymond; Francisco Armada; John Veysey; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas; Roberts, Emma (Perkins Coie); Lewitz, Matthew E. |
| **Subject:** | RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.) |
| | |
| **Categories:** | Red Category |

Thanks so much Mike. We appreciate the professional courtesy.

Kind regards,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>
**Sent:** Monday, August 5, 2024 4:03 PM
**To:** Fernandez, Michael <MFernandez@cozen.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>
**Cc:** de Leeuw, Michael <MdeLeeuw@cozen.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; John Veysey <john.veysey@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

**\*\*EXTERNAL SENDER\*\***

Michael

We agree on the extension.

---

**From:** Fernandez, Michael <MFernandez@cozen.com>
**Sent:** Monday, August 5, 2024 12:10 PM
**To:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>
**Cc:** de Leeuw, Michael <MdeLeeuw@cozen.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; John Veysey <john.veysey@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

Mike,

I can confirm that the firm's clients are the individual owners of the below cited accounts. I am not authorized to make any further disclosure about their identifies, which would in effect grant the relief you're seeking and obviate the point of appearing to oppose your application. In that respect, we would note that the practice in the Northern District of California has been for social media users to appear without disclosing their identity. *E.g.*, *In re Khrapunov*, No. 4:17-MC-80107-KAW, 2017 WL 5625931, at *4 (N.D. Cal. Nov. 22, 2017) ("Other courts in this district have allowed Does to challenge similar subpoenas to internet service providers.")(citing *Chevron Corp. v. Donziger*, No. 12-MC-80237 CRB (NC), 2013 WL 4536808, at *12 (N.D. Cal. Aug. 22, 2013) (Cousins, M.J.)); *hey, Inc. v. Twitter, Inc.*, No. 22-MC-80034-DMR, 2023 WL 3874022, at *1 (N.D. Cal. June 6, 2023) ("Does 1 and 2, the anonymous users of the accounts @cogitopp and @mlnk901, join Twitter's motion to quash.")

Please advise whether you will consent to our reasonable request for a modest extension or whether we should move by motion.

Thanks,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>
**Sent:** Monday, August 5, 2024 12:50 PM
**To:** Fernandez, Michael <MFernandez@cozen.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>
**Cc:** de Leeuw, Michael <MdeLeeuw@cozen.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; John Veysey <john.veysey@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

**\*\*EXTERNAL SENDER\*\***

Michael,

Thank you for email. However, you have not disclosed the identities of your clients. Lawyers represent individuals and they represent recognized entities such as corporations, LLC's and the like. In order to have inform conversation with our clients we need to understand on whose behalf you're making these requests please advise.

---

**From:** Fernandez, Michael <MFernandez@cozen.com>
**Sent:** Monday, August 5, 2024 8:49 AM
**To:** Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mike Hurvitz <mike.hurvitz@nelsonmullins.com>
**Cc:** de Leeuw, Michael <MdeLeeuw@cozen.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; John Veysey <john.veysey@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)
**Importance:** High

Good morning,

I hope you're well. I wanted to circle back on our previous email regarding a request for an extension.

Further to the below, I'm authorized to state that our firm represents the following accounts:

X Account Holders,
@FreddyOliviery;
@PonchoGutz;

Meta Account Holders,
 "Luis Guillermo Hernández";
"Hans Salazar"

Google LLC Account Holder,
"SinCensuraTVMedia"

Following my initial email, we determined that the earliest communication received by one of the handles we represent was sent on July 8, 2024 on the part of X. We would ask your consent to enter into the attached proposed stipulation of time that memorializes an extension to file a motion to quash/for protective order up through August 20, 2024—which would align any briefing with Meta and Google—and defers the provision of information/documents by X Corp., Google, and Meta to Banco Azteca while the motion is sub judice.

Adding in my colleague Matthew Lewitz from our Santa Monica office.

Could you please let us know your position today by 1:30pm PT?

We thank you for your courtesy.

Best regards,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** Hawk, Jon <jhawk@mwe.com>
**Sent:** Tuesday, July 30, 2024 12:50 PM
**To:** Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Fernandez, Michael <MFernandez@cozen.com>
**Cc:** de Leeuw, Michael <MdeLeeuw@cozen.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; John Veysey <john.veysey@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

**\*\*EXTERNAL SENDER\*\***

Michael,

X Corp. would not oppose your contemplated motion as described below.

Jon

JON HAWK
Partner
**McDermott Will & Emery LLP**  2049 Century Park East, Suite 3200, Los Angeles, CA 90067-3206
**Tel** +1 310 788 4181   **Mobile** +1 626 755 1400   **Email** jhawk@mwe.com
**Website** | **vCard** | **Twitter** | **LinkedIn**

---

**From:** Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>
**Sent:** Monday, July 29, 2024 9:11 AM
**To:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Fernandez, Michael <MFernandez@cozen.com>; Hawk, Jon <jhawk@mwe.com>
**Cc:** de Leeuw, Michael <MdeLeeuw@cozen.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; John Veysey <john.veysey@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

==[ External Email ]==
Thanks for your email. I'm adding Google's counsel and my colleague Emma. We'll get back to you shortly on this.

**Julie Schwartz | Perkins Coie LLP**
PARTNER
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.3840
F. +1.206.359.4840
E. JSchwartz@perkinscoie.com

---

**From:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>
**Sent:** Monday, July 29, 2024 8:14 AM
**To:** Fernandez, Michael <MFernandez@cozen.com>; jhawk@mwe.com; Schwartz, Julie (SEA) <JSchwartz@perkinscoie.com>
**Cc:** de Leeuw, Michael <MdeLeeuw@cozen.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; John Veysey <john.veysey@nelsonmullins.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

Michael,

Nice to meet you and welcome to the case.  Which "affected account holders" do you represent and on which platform(s)?

---

**From:** Fernandez, Michael <MFernandez@cozen.com>
**Sent:** Sunday, July 28, 2024 6:48 PM
**To:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; jhawk@mwe.com; JSchwartz@perkinscoie.com
**Cc:** de Leeuw, Michael <MdeLeeuw@cozen.com>
**Subject:** In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)
**Importance:** High

Dear Colleagues,

We hope this email finds you well.

Our firm is in the process of being engaged by certain of the affected social media account holders. As contemplated in Magistrate Judge Cousins's order (attached), we plan to file papers objecting to the subpoena and/or moving for a protective order.

We are still working with the affected account holders to understand when they received notice of the subpoena. Based on a review of the docket, however we understand that the subpoenas were served on July 2, 2024. As such, we understand that there may be a deadline to move of Tuesday, July 30, 2024. Given the timing, we would request your consent or non-opposition to a forthcoming motion to: 1) adjourn the deadline to file our papers until August 20, 2024 and 2) defer the provision of information/documents by X Corp., Google, and Meta to Banco Azteca while the objection is sub judice. Can you please let us know your position by 12 pm PT tomorrow?

Thank you in advance for your attention to this matter.

Kind regards,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

***Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.***

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

NOTICE: This communication from Perkins Coie LLP may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

*********************************************************************************************************

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by privilege. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited. Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Our Privacy Policy explains how we may use your personal information or data and any personal information or data provided or made available to us. Thank you.

*********************************************************************************************************

Please visit http://www.mwe.com/ for more information about our Firm.


**Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.**


**Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.**

# EXHIBIT B

**Fernandez, Michael**

| | |
|---|---|
| **From:** | Fernandez, Michael |
| **Sent:** | Monday, August 19, 2024 10:53 PM |
| **To:** | John Veysey |
| **Cc:** | Mike Hurvitz; Hawk, Jon; Schwartz, Julie (Perkins Coie); Mark Raymond; Francisco Armada; Byron.Tuay@bakermckenzie.com; Kennedy, Nicholas; Roberts, Emma (Perkins Coie); Lewitz, Matthew E. |
| **Subject:** | RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.) |
| **Attachments:** | Stipulation for Extension of Time (Cozen Edits).doc |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |
| | |
| **Categories:** | Red Category |

John,

Thanks again for your time and courtesy this afternoon. As discussed, I'm attaching a proposed stipulation that omits the language Banco Azteca finds objectionable concerning Ricardo Salinas Pliego while otherwise preserving the balance of the language articulating the Affected Account Holders' position in the stipulation—i.e., that they object to the use of 28 USC 1782 proceedings against them generally. As further discussed, I will be moving the language that Banco Azteca finds objectional to my declaration. Please let me know if the revised stipulation is acceptable to you and I will affix Mike Hurvitz's signature to the proposed stipulation and get it filed tomorrow.

With respect to the issue of the criminal complaint, I'm afraid that I'm more confused now than I was before our conversation. Specifically, and please correct me if I'm mistaken in my recollection of our conversation, you mentioned that there was 1) a concern over some privilege issues and 2) something about how the investigation is being carried out in Mexico. Can you please provide more context as to 1) what the privilege concern is and 2) what about how the investigation is being carried out in Mexico justifies withholding the complaint in this proceeding?

Frankly, I'm concerned that the criminal case was initiated in Jalisco, which is not exactly known for having a strong and independent judiciary (e.g., https://mexiconewsdaily.com/news/red-flag-for-judicial-corruption/; https://arbitrationblog.kluwerarbitration.com/2021/10/30/denial-of-justice-by-mexican-courts-to-canadian-investment-fund-under-nafta-the-first-of-its-kind/). Why that jurisdiction? In that respect, Banco Azteca's shift to a purported civil proceeding is troubling and sounds like a pretextual means to avoid divulging the criminal complaint and ultimately using information obtained in the U.S. to pursue proceedings in such a dangerous jurisdiction. Alternatively, there's always the possibility that Banco Azteca has filed a frivolous criminal proceeding in Mexico and is withholding the complaint and related documents due to concerns over a malicious prosecution type counterclaim by the account holders. Given Banco Azteca's lack of transparency, it's hard to know what's truly going on. Under the circumstances, I think disclosure of what Banco Azteca is pursuing in Jalisco is warranted.

On behalf of my clients, I reserve all rights.

Thanks,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007

P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** John Veysey <john.veysey@nelsonmullins.com>
**Sent:** Monday, August 19, 2024 3:54 PM
**To:** Fernandez, Michael <MFernandez@cozen.com>
**Cc:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

**<span style="color:red">**EXTERNAL SENDER**</span>**

Michael,

Addressing your first and third points together, on the standing issue, we acknowledge receipt of your client's position and like my earlier email, reserve all rights and otherwise do not waive any related position or argument. That said, as a compromise and to get this done and to resolve your concern that this will perplex the Court, let's revert to your original language on the first of the two paragraphs on p. 3 that we've been discussing.

Regarding the second paragraph and your other arguments, if we do revert to your other language, can we leave the second paragraph out? Again, we're not trying to be sanctimonious or pedantic here, but the content of this stipulation, the chances the court will allow it, and where the action proceeds from here, will not change one way or the other because you were able to add this specific substantive argument. For reasons I hope you understand, it doesn't seem necessary to include this point, and we're not really interested in signing a stipulation that includes a personal knock against our clients and their motives. Your citation to the language about X's prior motion is demonstrative – that just makes a cross-reference to a motion already filed – it doesn't include specifics like the proposed language here. If anything, and mirroring your position about distracting the Court, leaving that language out probably improves our chances the Court will allow the stipulation so they don't have to think twice about whether they're endorsing any substantive position in the stipulation.

Again, if a phone call is easier, I'm at 415-205-5181. I can separately address your questions about the pending criminal investigation also, where it will probably be easier to discuss.

Thanks,

john

---

P. JOHN VEYSEY  OF COUNSEL
john.veysey@nelsonmullins.com
ONE FINANCIAL CENTER | SUITE 3500
BOSTON, MA 02111
T 617.217.4645   F 617.217.4710

PACIFIC GATEWAY | SUITE 900

19191 SOUTH VERMONT AVENUE | TORRANCE, CA 90502

T 424.221.7400  F 424.221.7499

NELSONMULLINS.COM  VCARD  VIEW BIO

---

**From:** Fernandez, Michael <MFernandez@cozen.com>
**Sent:** Monday, August 19, 2024 12:38 PM
**To:** John Veysey <john.veysey@nelsonmullins.com>
**Cc:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

John,

Thanks for your response.

Unless Banco Azteca plans to drop my clients from its 1782 application, they will have standing to challenge Banco Azteca's application and/or subpoena(s). *E.g.*, *Chevron Corp. v. Donziger*, No. 12-MC-80237 CRB (NC), 2013 WL 4536808, at *4-5 (N.D. Cal. Aug. 22, 2013) (Cousins, M.J.).

Given that my clients will have standing to object to the forthcoming 1782 Application/subpoena, I respond to each of your comments regarding the proposed language to the stipulation in turn.

With respect to the second paragraph on page 3 ("Affected Account Holders have not been consulted about or otherwise reviewed Banco Azteca's Contemplated Amended Application and, to the extent they are included therein, object to the use of 28 U.S.C. § 1782 to vexatiously harass social media commentators who have a different political viewpoint than Ricardo Salinas Pliego, the chair of Applicant Banco Azteca's parent company"), I would note the following language in last week's subpoena:

> WHEREAS, X Corp. has not reviewed Banco Azteca's Contemplated Amended Application, and takes no position on whether Banco Azteca's contemplated amendments may narrow or resolve any of the Parties' objections to the Initial Subpoenas, or any of the issues raised in X Corp.'s pending Motion to Quash;

> WHEREAS, X Corp. nonetheless does not oppose Banco Azteca's request to file its Contemplated Amended Application, and reserves all rights with respect thereto

As you will see, X asserts its lack of review and its position on your application. We are proposing to do the same here. Given that you acquiesced to letting X state its position, I don't see what the problem is with my clients' position being stated in this stipulation.  The proposed language is not in inconsistent with what was in the stipulation last week.

With respect to the first paragraph on page 3 ("the Affected Account Holders were not consulted concerning the aforementioned joint stipulation between Banco Azteca and X (ECF No. 35) and were otherwise not included in the revised briefing schedule proposed to the Court therein"), the lack of explanation as to why the Affected Account Holders weren't included in the stipulation is going to leave the judge scratching his head. And I do not want it to seem as if my clients were obdurate or otherwise responsible for not being included when Banco Azteca never reached out in the first instance.

3

If you are not amenable to including the proposed language or some acceptable variation thereof, please let me know so I can seek relief by way of motion with the Court. This is a case about speech and the last thing I want is to have my clients' voices be silenced.

Finally, we have been asking for information during the past week about the basis for Banco Azteca's criminal proceeding in Mexico. We have received no follow up to our inquiries. As I noted previously, I have been told that it's fairly common for parties to share information about criminal proceedings, including with the media in Mexico. I'd therefore like to further understand the basis for the assertion that Banco Azteca can't share that information in this proceeding.

Thanks,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** John Veysey <john.veysey@nelsonmullins.com>
**Sent:** Monday, August 19, 2024 11:05 AM
**To:** Fernandez, Michael <MFernandez@cozen.com>
**Cc:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com>; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

**\*\*EXTERNAL SENDER\*\***

Michael,

Our rationale in making the edits on page 3 is only to find the path of least resistance. These edits ensure the stipulation is consistent with the one the Court allowed last week. We expect the Court is more likely to allow this stipulation if the only other differences are adding an additional party and referencing prior entries on the docket. Without going into substance, the two paragraphs on page 3 are otherwise extraneous to the purpose of the stipulation, particularly where the next paragraph that we are fine retaining covers the same ground.

While we continue to reserve all rights regarding whether the parties of the subject matter of a subpoena are themselves entitled to input regarding an amended application, if it helps us finalize this, we propose the attached edited version of that first paragraph. The attachment includes that edit.

Regarding your second paragraph, none of the parties have reviewed the amended application. That probably obviates that paragraph's purpose. Your other language in that paragraph asserts substantive and ad hominem positions and don't belong in this stipulation. Again, as the subsequent paragraph explains, all parties will have other opportunities to clarify and articulate their positions at later points.

We remain available and happy to jump on the phone to discuss this, and please let us know if you have any other questions.

john

---

**P. JOHN VEYSEY**  OF COUNSEL
john.veysey@nelsonmullins.com

ONE FINANCIAL CENTER | SUITE 3500
BOSTON, MA 02111
T 617.217.4645  F 617.217.4710

PACIFIC GATEWAY | SUITE 900
19191 SOUTH VERMONT AVENUE | TORRANCE, CA 90502
T 424.221.7400  F 424.221.7499

NELSONMULLINS.COM  VCARD  VIEW BIO

---

**From:** Fernandez, Michael <MFernandez@cozen.com>
**Sent:** Sunday, August 18, 2024 5:10 PM
**To:** John Veysey <john.veysey@nelsonmullins.com>
**Cc:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

John,

Thanks for responding with your comments over a weekend. It's very much appreciated.

We're okay with Banco Azteca's proposed omission of the language on page 2 concerning the stipulations with Google and Meta. That was already included in the prior stipulation between Banco Azteca and the Affected Account Holders, ECF No. 30. And, while we think it would be helpful to remind the court of the development, we also don't think it's problematic for it to come out.

With respect to Banco Azteca's proposed omissions on page 3, can you please advise on your rationale?

With respect to the first paragraph that Banco Azteca is asking to come out of the stipulation, the fact remains that Banco Azteca did not consult with the Affected Account Holders in proposing an entirely new briefing schedule (which, frankly, is a really inconvenient schedule for their counsel due to travel) and did not include the Affected Account Holders in the revised briefing schedule. So, I guess I'm curious as to what the issue is with including in the stipulation?

With respect to the second paragraph the Banco Azteca is seeking to omit, we're very concerned that Banco Azteca is asking the Affected Account Holders to omit their position vis-à-vis the proceeding (because they object) but that no such omission was made of X (which was allowed to express its view on the proceeding). This is the first time I've ever been in a case where a counterparty has asked me to strike the position of its adversaries from a stipulation, so I'm somewhat troubled by your request. We're happy to make it clearer that Banco Azteca is not acquiescing to the objection, etc. That said, we'd like to understand what the rationale is for asking the Affected Account Holders to remove their litigation position from this stipulation (as opposed to, say, just adding Banco Azteca's view on the proceeding's propriety, etc.).

Thanks,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** John Veysey <john.veysey@nelsonmullins.com>
**Sent:** Sunday, August 18, 2024 4:11 PM
**To:** Fernandez, Michael <MFernandez@cozen.com>
**Cc:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

**\*\*EXTERNAL SENDER\*\***

Michael,

Attached are a few redlines to the stipulation. Please let us know if you have any questions.

Many thanks,

john

---

**P. JOHN VEYSEY** OF COUNSEL
john.veysey@nelsonmullins.com

ONE FINANCIAL CENTER | SUITE 3500
BOSTON, MA 02111
T 617.217.4645  F 617.217.4710

PACIFIC GATEWAY | SUITE 900
19191 SOUTH VERMONT AVENUE | TORRANCE, CA 90502
T 424.221.7400  F 424.221.7499

NELSONMULLINS.COM   VCARD   VIEW BIO

---

**From:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>
**Sent:** Sunday, August 18, 2024 2:48 PM
**To:** Fernandez, Michael <MFernandez@cozen.com>
**Cc:** Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <Mark.Raymond@nelsonmullins.com>; Francisco Armada <Francisco.Armada@nelsonmullins.com>; John Veysey <john.veysey@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz,

Matthew E. <[MLewitz@cozen.com](mailto:MLewitz@cozen.com)>
**Subject:** Re: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

I'll be back at a computer by about 3pm pacific and will send you a redline version if John doesn't send before then.

On Aug 18, 2024, at 11:37 AM, Fernandez, Michael <[MFernandez@cozen.com](mailto:MFernandez@cozen.com)> wrote:

Mike,

Thanks for your response, which I very much appreciate.

I haven't yet received a response from John and would appreciate it today, if at all possible, so we can evaluate your proposed changes to the draft stipulation.

Thanks,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** Mike Hurvitz <[mike.hurvitz@nelsonmullins.com](mailto:mike.hurvitz@nelsonmullins.com)>
**Sent:** Sunday, August 18, 2024 2:20 PM
**To:** Fernandez, Michael <[MFernandez@cozen.com](mailto:MFernandez@cozen.com)>
**Cc:** Hawk, Jon <[jhawk@mwe.com](mailto:jhawk@mwe.com)>; Schwartz, Julie (Perkins Coie) <[JSchwartz@perkinscoie.com](mailto:JSchwartz@perkinscoie.com)>; Mark Raymond <[Mark.Raymond@nelsonmullins.com](mailto:Mark.Raymond@nelsonmullins.com)>; Francisco Armada <[Francisco.Armada@nelsonmullins.com](mailto:Francisco.Armada@nelsonmullins.com)>; John Veysey <[john.veysey@nelsonmullins.com](mailto:john.veysey@nelsonmullins.com)>; [Byron.Tuyay@bakermckenzie.com](mailto:Byron.Tuyay@bakermckenzie.com); Kennedy, Nicholas <[Nicholas.Kennedy@bakermckenzie.com](mailto:Nicholas.Kennedy@bakermckenzie.com)>; Roberts, Emma (Perkins Coie) <[EmmaRoberts@perkinscoie.com](mailto:EmmaRoberts@perkinscoie.com)>; Lewitz, Matthew E. <[MLewitz@cozen.com](mailto:MLewitz@cozen.com)>
**Subject:** Re: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

**\*\*EXTERNAL SENDER\*\***

Michael

I'm away from computer right now.  We were ok with moving the deadlines but had issues with some of the dicta.

I think John Veysey was going to redline the stip.  not sure if he had done that yet.

On Aug 18, 2024, at 10:56 AM, Fernandez, Michael <[MFernandez@cozen.com](mailto:MFernandez@cozen.com)> wrote:

Mike,

I'm sorry to bother over the weekend. I just wanted to briefly follow up with you to

confirm that you were agreeable to the stipulation I circulated on Friday as I'd like to be able to get it on file tomorrow.  Given the imminent deadline, I'd ask that you please let me know today your position so as to head of a last-minute scramble on our part.

Thanks,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** Fernandez, Michael
**Sent:** Friday, August 16, 2024 10:19 AM
**To:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>
**Cc:** Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; John Veysey <john.veysey@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

Mike,

Further to my previous email, I'm attaching a draft stipulation which largely tracks the stipulation that Banco Azteca entered into with X for your review and/or comment. Please let me know if you have any comments or if you otherwise are okay with the draft stipulation, ideally later today or over the weekend so that we can get this filed on Monday.

I also wanted to follow up on my question as to why you don't think you're able to share the criminal complaint, etc.

Byron, Jon, and Julie,

Can you please let us know if you are okay with the outlines of the proposed stipulation?

Best regards,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

**From:** Fernandez, Michael
**Sent:** Wednesday, August 14, 2024 6:16 PM
**To:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>
**Cc:** Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie)
<JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>;
Francisco Armada <francisco.armada@nelsonmullins.com>; John Veysey
<john.veysey@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy,
Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie)
<EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091
NC (N.D. Cal.)

Mike,

Thanks for your courtesy.

Would you be amenable to sending me a draft stipulation? If not, I'll otherwise prepare
and circulate.

With respect to the purported criminal matter in Mexico, I understand that under
Mexican law the complaining party has no legal restrictions in making public a criminal
complaint. Given that, I'm not sure why you wouldn't be able to provide even just that
document.  Can you advise as to why you think you're not able to share it?

Thanks,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>
**Sent:** Wednesday, August 14, 2024 12:15 PM
**To:** Fernandez, Michael <MFernandez@cozen.com>
**Cc:** Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie)
<JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>;
Francisco Armada <francisco.armada@nelsonmullins.com>; John Veysey
<john.veysey@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy,
Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie)
<EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091
NC (N.D. Cal.)

**\*\*EXTERNAL SENDER\*\***

Michael

We are happy to enter into a stipulation with the account holders you represent and
give them a similar extension.

We are not able to provide you with the criminal complaint and/or subsequent filings.

Mike

---

**From:** Fernandez, Michael <<MFernandez@cozen.com>>
**Sent:** Wednesday, August 14, 2024 7:46 AM
**To:** Mike Hurvitz <<mike.hurvitz@nelsonmullins.com>>
**Cc:** Hawk, Jon <<jhawk@mwe.com>>; Schwartz, Julie (Perkins Coie) <<JSchwartz@perkinscoie.com>>; Mark Raymond <<Mark.Raymond@nelsonmullins.com>>; Francisco Armada <<Francisco.Armada@nelsonmullins.com>>; John Veysey <<john.veysey@nelsonmullins.com>>; <<Byron.Tuyay@bakermckenzie.com>>; Kennedy, Nicholas <<Nicholas.Kennedy@bakermckenzie.com>>; Roberts, Emma (Perkins Coie) <<EmmaRoberts@perkinscoie.com>>; Lewitz, Matthew E. <<MLewitz@cozen.com>>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

Mike,

Thanks for your response.

Your stipulation obviously went beyond X and proposed a briefing schedule as to Google and Meta, too. Given that, I'm at a loss as to why my clients were omitted from the proposed schedule. In any event, can you please let me today know whether you intend to enter into a stipulation with the account holders I represent giving them a similar extension to X, Meta and Google?

With respect to the alleged criminal complaint as well as the subsequent filings, I'd be happy to chat over the coming days. That said, I'm not sure why there is a need to have a conversation. I understand your client has the right to share the documents, so I'd just like to know whether they will be provided forthwith, provided in the amended application or not provided at all.

Thanks,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** Mike Hurvitz <<mike.hurvitz@nelsonmullins.com>>
**Sent:** Wednesday, August 14, 2024 12:17 AM
**To:** Fernandez, Michael <<MFernandez@cozen.com>>
**Cc:** Hawk, Jon <<jhawk@mwe.com>>; Schwartz, Julie (Perkins Coie) <<JSchwartz@perkinscoie.com>>; Mark Raymond <<Mark.Raymond@nelsonmullins.com>>; Francisco Armada <<Francisco.Armada@nelsonmullins.com>>; John Veysey <<john.veysey@nelsonmullins.com>>; <<Byron.Tuyay@bakermckenzie.com>>; Kennedy, Nicholas <<Nicholas.Kennedy@bakermckenzie.com>>; Roberts, Emma (Perkins Coie) <<EmmaRoberts@perkinscoie.com>>; Lewitz, Matthew E. <<MLewitz@cozen.com>>

**Subject:** Re: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

**\*\*EXTERNAL SENDER\*\***

Michael

I was tied up in a mediation all day today.  Happy to schedule a call to discuss the issues you raise in you raised in your emails.

The stipulation filed today dealt with the briefing schedule for the MTQ filed by X.   We were dealing with a deadline for Banco to file an opposition to the MTQ and Banco and X wanted to revise the schedule.

Let us know what days and times work best for you this week.

Mike

Mike

> On Aug 13, 2024, at 8:28 PM, Fernandez, Michael <MFernandez@cozen.com> wrote:
>
> Mike,
>
> I wanted to briefly follow up on my email below and inquire whether you will be sharing the alleged criminal complaint as well as the subsequent filings.
>
> I also reviewed the stipulation that was filed a short while ago and noticed that my clients were not included in the proposed briefing schedule. Can you please explain why?
>
> I reserve all rights on behalf of my clients.
>
> Thanks,
> Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** Fernandez, Michael
**Sent:** Tuesday, August 13, 2024 1:03 AM
**To:** 'Mike Hurvitz' <mike.hurvitz@nelsonmullins.com>; 'Hawk, Jon' <jhawk@mwe.com>; 'Schwartz, Julie (Perkins Coie)' <JSchwartz@perkinscoie.com>
**Cc:** 'Mark Raymond' <mark.raymond@nelsonmullins.com>; 'Francisco Armada' <francisco.armada@nelsonmullins.com>; 'John Veysey' <john.veysey@nelsonmullins.com>; 'Byron.Tuyay@bakermckenzie.com'

<[Byron.Tuyay@bakermckenzie.com](mailto:Byron.Tuyay@bakermckenzie.com)>; 'Kennedy, Nicholas'
<[Nicholas.Kennedy@bakermckenzie.com](mailto:Nicholas.Kennedy@bakermckenzie.com)>; 'Roberts, Emma (Perkins
Coie)' <[EmmaRoberts@perkinscoie.com](mailto:EmmaRoberts@perkinscoie.com)>; Lewitz, Matthew E.
<[MLewitz@cozen.com](mailto:MLewitz@cozen.com)>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case
No. 24-mc-80091 NC (N.D. Cal.)

Mike,

I hope this email finds you well.

Extensive reference is made in Banco Azteca's 1782 Application to "a
criminal complaint, which was registered under investigation folder
number 5101/202254 of Agency 4 of Bulk Processing of the Public
Prosecutor's Office of the State of Jalisco" filed on January 19, 2024 (ECF
1 at 8) as well as subsequent filings and orders issued in that proceeding
(ECF 1 at 8-10). Despite this, the Application does not attach a copy of
the alleged criminal complaint in the Mexican proceeding nor other
filings from it.

We are in the process of preparing our motion papers. Given that the
purported criminal proceeding underpins your Application, please
advise whether you will provide the parties with the alleged criminal
complaint as well as the subsequent filings.

Michael

 **Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

*Notice: This communication, including attachments, may
contain information that is confidential and protected by the
attorney/client or other privileges. It constitutes non-public
information intended to be conveyed only to the designated
recipient(s). If the reader or recipient of this communication is
not the intended recipient, an employee or agent of the
intended recipient who is responsible for delivering it to the
intended recipient, or you believe that you have received this
communication in error, please notify the sender immediately
by return e-mail and promptly delete this e-mail, including
attachments without reading or saving them in any manner. The
unauthorized use, dissemination, distribution, or reproduction
of this e-mail, including attachments, is prohibited and may be
unlawful. Receipt by anyone other than the intended
recipient(s) is not a waiver of any attorney/client or other
privilege.*

**Confidentiality Notice**
This message is intended exclusively for the individual or entity to which it is
addressed. This communication may contain information that is proprietary,

privileged, confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately either by phone (800-237-2000) or reply to this e-mail and delete all copies of this message.

*Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.*

*Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.*

*Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.*

*Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be*

*conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.*

*Notice: This communication, including attachments, may contain information that is confidential and protected by the attorney/client or other privileges. It constitutes non-public information intended to be conveyed only to the designated recipient(s). If the reader or recipient of this communication is not the intended recipient, an employee or agent of the intended recipient who is responsible for delivering it to the intended recipient, or you believe that you have received this communication in error, please notify the sender immediately by return e-mail and promptly delete this e-mail, including attachments without reading or saving them in any manner. The unauthorized use, dissemination, distribution, or reproduction of this e-mail, including attachments, is prohibited and may be unlawful. Receipt by anyone other than the intended recipient(s) is not a waiver of any attorney/client or other privilege.*

# EXHIBIT C

**Fernandez, Michael**

| | |
|---|---|
| **From:** | Fernandez, Michael |
| **Sent:** | Tuesday, September 3, 2024 4:20 PM |
| **To:** | John Veysey |
| **Cc:** | Mike Hurvitz; Hawk, Jon; Schwartz, Julie (Perkins Coie); Mark Raymond; Francisco Armada; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas; Roberts, Emma (Perkins Coie); Lewitz, Matthew E. |
| **Subject:** | RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.) |
| **Categories:** | Red Category |

Hi John,

I hope everyone is well and had a good Labor Day weekend. I wanted to follow up again on my below query. Please advise.

Thanks,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** Fernandez, Michael
**Sent:** Monday, August 26, 2024 2:20 PM
**To:** John Veysey <john.veysey@nelsonmullins.com>
**Cc:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

Hi John,

I hope you're well. I wanted to briefly circle back on my below query.

Best regards,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

**From:** Fernandez, Michael
**Sent:** Tuesday, August 20, 2024 5:26 PM
**To:** John Veysey <john.veysey@nelsonmullins.com>
**Cc:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

John,

Thanks for your response.

I understood that you were in transit, which is why I wanted to make sure I clarified what your position is.

For the avoidance of doubt, we're not looking to get into Nelson Mullin's advice to Banco Azteca client. To the extent that my emails may have given that suggestion, I want to clarify that was not in any way our intention.

What my clients are interested in is the underlying documents that have been filed with and/or issued by the Jalisco court. It sounds like you do not have any copies of what was filed and/or issued. Is that correct?

Thanks, again,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

---

**From:** John Veysey <john.veysey@nelsonmullins.com>
**Sent:** Tuesday, August 20, 2024 12:10 PM
**To:** Fernandez, Michael <MFernandez@cozen.com>
**Cc:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz, Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

**\*\*EXTERNAL SENDER\*\***

Michael,

The edited stipulation looks great. You can sign on our behalf.

Regarding the criminal complaint, apologies for any lack of clarity on my part as I was driving during our call, but my position was and remains relatively simple. We understand the authorities in Mexico have an ongoing investigation. For obvious reasons, my team is not involved in that investigation. We are not prepared to collect and share information with your clients about that investigation, and we will not do so. Your clients are demanding to know the reason why we won't collect and share this information. What they're demanding would violate attorney/client privilege. Our

conversation yesterday was amicable and I took care to preface that part of the discussion that our privilege position is not to be uncooperative or cagey, we are just not willing to divulge information that would disclose underlying strategy and rationale.

Regarding your other positions, like our other discussions this week, I don't think this email chain is the best place to resolve those issues, to the extent we're even qualified to address some of what you raise below. We will continue to reserve all rights on those and your other positions.

Again, available to touch base over the phone, so feel free to give me a call.

Thanks,

john

# EXHIBIT D

## Fernandez, Michael

| | |
|---|---|
| **From:** | Fernandez, Michael |
| **Sent:** | Wednesday, September 11, 2024 8:23 PM |
| **To:** | John Veysey |
| **Cc:** | Mike Hurvitz; Hawk, Jon; Schwartz, Julie (Perkins Coie); Mark Raymond; Francisco Armada; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas; Roberts, Emma (Perkins Coie); Lewitz, Matthew E. |
| **Subject:** | RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.) |
| **Categories:** | Red Category |

Hi John,

Thanks for your response.

The Federal Rules require that documents submitted to the court be well grounded in fact, warranted by existing law and not be interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. Thus, there is a need "for some prefiling inquiry into both the facts and the law to satisfy the affirmative duty imposed by the rule.'" *Lloyd v. Schlag*, 884 F.2d 409, 412 (9th Cir. 1989). In that respect, "[a]n attorney has not made a 'reasonable inquiry' concerning the facts, if he has not made any inquiry, or if he has relied only on his client, when time permitted him to make a further investigation. A [party] must not be joined, or claim asserted against a [party] merely in the hope that discovery will turn up something against that [party]." *Whittington v. Ohio River Co.*, 115 F.R.D. 201, 206 (E.D. Ky. 1987).

Nearly five months have elapsed since Banco Azteca first filed its Application. Despite the time lapse, Nelson Mullins has seemingly not undertaken any investigation regarding the case in Mexico and apparently relied exclusively on the account of Banco Azteca's lawyers in Mexico. Have you, at a minimum, confirmed whether the accounts of John Does 1-5 for which Banco Azteca is seeking information actually are referenced/named in the criminal complaint in Mexico?

On a separate note, Banco Azteca states in the Amended Application that it "has commenced a civil action against certain individuals." ECF No. 39-3 at 5. Can you please advise as to which individuals had been sued?

For the avoidance of doubt, we reserve our right to take up the apparent lack of pre-filing investigation with the Court.

Best,
Michael



**Michael A. Fernández**
**Member | Cozen O'Connor**
3 WTC, 175 Greenwich Street 55th Floor | New York, NY 10007
P: 212-453-3713 F: 646-461-2075
Email | Map | cozen.com

**From:** John Veysey <john.veysey@nelsonmullins.com>
**Sent:** Monday, September 9, 2024 11:10 AM
**To:** Fernandez, Michael <MFernandez@cozen.com>
**Cc:** Mike Hurvitz <mike.hurvitz@nelsonmullins.com>; Hawk, Jon <jhawk@mwe.com>; Schwartz, Julie (Perkins Coie) <JSchwartz@perkinscoie.com>; Mark Raymond <mark.raymond@nelsonmullins.com>; Francisco Armada <francisco.armada@nelsonmullins.com>; Byron.Tuyay@bakermckenzie.com; Kennedy, Nicholas <Nicholas.Kennedy@bakermckenzie.com>; Roberts, Emma (Perkins Coie) <EmmaRoberts@perkinscoie.com>; Lewitz,

Matthew E. <MLewitz@cozen.com>
**Subject:** RE: In re 1782 Subpoena Application by BANCO AZTECA, Case No. 24-mc-80091 NC (N.D. Cal.)

**\*\*EXTERNAL SENDER\*\***

Hi Michael,

My apologies on the late reply, but hope you also had an enjoyable weekend. Our position remains the same as before: Banco Azteca will not share a copy of the "underlying documents filed with and/or issued by the Jalisco court" – to use your language – particularly where a criminal investigation may be ongoing. We reiterate that Banco Azteca has no duty to share those materials in this context under Mexico or United States law. Regarding the latter, we reiterate that if your clients wish to challenge this, the briefing process here affords sufficient opportunity to do so. We note that attorneys for Banco Azteca affirmed under oath in the original application as to the progress of the criminal action underway in Mexico, including the investigation folder number (see, e.g. Ex. C, ¶ 9) (ECF 1-3). We accordingly defer to the processes and regulations followed by the relevant law enforcement divisions in that jurisdiction and related law, including, but not limited to, confidentiality requirements. As to Banco Azteca's other reasons for its position, we continue to reserve all rights, including attorney work product and attorney-client privilege protections. Banco Azteca more generally reserves all other rights.

Many thanks,

john

# EXHIBIT E





Home › News

# Jalisco identified as a 'red flag' for judicial corruption

**Simon Schatzberg**  May 16, 2019  💬 0



*Chief Justice Zaldívar: eyes on Jalisco.*

Jalisco is one of five problem states for corrupt judges according to a map of corruption allegations against federal judges and magistrates across the country.

Since the previous federal government, the Supreme Court has

been focused on the issue in Jalisco, where corruption cases, collusion between officials and organized crime and sexual and labor harassment have been a problem for the federal judicial branch.

Late last year then-Chief Justice Luis María Aguilar Morales presented a map detailing judicial corruption allegations, identifying Jalisco, Puebla, Veracruz, San Luis Potosí and Zacatecas as "red flags."

Current Chief Justice Arturo Zaldívar Lelo de Larrea has focused on addressing corruption in the third circuit in Jalisco, which has been considered a center for corruption for at least eight years, when investigations of judicial officials were first ordered.

But in spite of the investigations, judicial corruption is still rampant in the state.

On May 3, the chief justice told *El Universal* that a "renewal" was under way in the third circuit, which includes investigations, disciplinary actions and reassignments of federal judges and magistrates.

"We think reassignments are important to bring in new blood," Zaldívar said.

The judicial branch is also collaborating with the Financial Intelligence Unit (UIF) to detect irregularities in the income of federal officials.

⊘

The UIF recently froze 50 million pesos (US $2.6 million) in bank accounts belonging to a federal magistrate who is accused of giving favorable rulings to members of the Jalisco New Generation Cartel (CJNG). According to *Reforma*, the magistrate is Isidro Avelar Gutiérrez.

Last April, Senator Ricardo Monreal accused Avelar of having met with relatives of Nemesio "El Mencho" Oseguera Cervantes, leader of the CJNG, and having ordered the release of his son, who was accused of money laundering and organized crime.

Avelar is one of those judges who have been reassigned. He is now working at a federal court in Chilpancingo, Guerrero.

Sources told *El Universal* that judges and magistrates accused of corruption are reassigned when there is not enough evidence to open a formal investigation against them. Once an investigation is opened, they must be suspended.

Between 2017 and 2018, the Supreme Court ordered 36 disciplinary proceedings against federal judges, magistrates and secretaries, of which seven were in Jalisco.

*Source: El Universal (sp), Reforma (sp)*

▪ ▪ ▪

MND_ YOU MAY ALSO LIKE

# EXHIBIT F

# Kluwer Arbitration Blog

## Denial of Justice by Mexican Courts to Canadian Investment Fund under NAFTA: the First of its Kind

Fernando Pérez-Lozada (CMS) · Saturday, October 30th, 2021

*Lion Mexico Consolidated v. Mexico*[1] represents the *first* positive finding of denial of justice in the history of NAFTA[2] and one of the rearrest recent examples in investor-state arbitration.

On 20 September 2021, a NAFTA tribunal seated in Washington, D.C., held Mexico liable for denial of justice by the Mexican judiciary, ordering the State to pay US$ 47 million for "full reparation" (plus legal fees and arbitration costs) to Lion Mexico Consolidated L.P. ("**LMC**"), a Canadian entity incorporated in Quebec and domiciled in Texas, USA.

### Background

LMC granted three loans totalling US$ 32.8 million to a Mexican businessman (the "**Debtor**") to acquire land and develop two skyscrapers and a luxury ocean-front resort in Jalisco and Nayarit, respectively, secured by three mortgages over the properties in question.

After LMC attempted to foreclose a mortgage to recover the unpaid loans, it discovered that all mortgages had been cancelled by a judge in Jalisco (at the Debtor's request) without its participation. This "**Cancellation Judgment**" was based on a Settlement Agreement allegedly signed by LMC, in which it accepted payment of the loans (and cancellation of the mortgages) in exchange of shares in the Debtor's companies (the "**Forged Document**"). LMC tried to revert the illegal cancellation of the mortgages for almost three years before the Mexican courts, and falling to do so, it lodged an investment arbitration against Mexico.

### Jurisdictional phase

Back in 2018, the Tribunal was confronted with a novel issue: whether or not mortgages qualify as an investment under NAFTA. The Tribunal found that mortgages meet the two-fold requirement of Article 1139(g): being "intangible" real estate, "used for economic benefit". The Tribunal found that mortgages are *in rem* rights (*derechos reales*) under Mexican law, while treaty practice confirms the same understanding, as Mexico had concluded other 22 BITs where "mortgages" were expressly recognised as an investment (e.g., the Spain-Mexico BIT).[3]  In line with the

Tribunal's finding, the new NAFTA (known as "USMCA") signed by the US, Mexico and Canada – in force as of 1 July 2020 – expressly includes "mortgages" as a covered investment under Article 14.1(h).

**The Parties' positions on the merits**

LMC alleged it was not properly summoned in the proceedings that cancelled its mortgages *in absentia* ("**Cancellation Proceeding**") and then, it was deprived of its right of defense to revert said cancellation before higher courts, which repeatedly denied any opportunity to prove the forgery of the Settlement Agreement upon which its investment was cancelled.

Mexico alleged that Mexican courts acted in accordance with the law, while LMC was negligent in its legal defence. Mexico alleged that it was also the *victim* of a sophisticated fraud by the Debtor, while LMC had not exhausted all the available remedies, as condition precedent to denial of justice. In its view, LMC could obtain compensation from criminal proceedings against the Debtor.

**The Tribunal's findings**

1. **Standard of proof**

The Tribunal followed the *Mondev* standard as a "guide", albeit with some precisions. In its view, denial of justice involves an "objective test", which: "*requires a finding of an improper and egregious procedural conduct by the local courts (whether intentional or not), which does not meet the basic internationally accepted standards of administration of justice and due process, and which shocks or surprises the sense of judicial propriety.*"[4] In other words, the Tribunal clarified that a breach must be *procedural* and not substantive; rejected the need to prove an *intentional* conduct (e.g., bad faith); while required a level of gravity to *shock or surprise*, contrary to *basic* yet *internationally accepted* standards of justice.

2. **Denial of Justice**

The Tribunal recognised three types of denial of justice claims related to: i) the right to access justice (e.g., lodge an appeal); ii) the right to be heard (e.g., to present evidence); and iii) undue court delay.

The Tribunal found unanimously that Mexico denied "procedural justice" (and FET) to LMC, in breach of Article 1105 of NAFTA, for the first two types of claims (referred to above), while considering it needless to address the claim for undue delay.

The Tribunal first gave deference to and presumed that the municipal courts had acted properly, while it did not pass judgment on the propriety of the entire Mexican judicial system. It then accepted Mexican courts acted in good faith (i.e., without colluding with the fraudsters or

colluding in corruption, as this was not raised by LMC). However, the Tribunal held that the existence of a "sophisticated fraud" by the Debtor to cancel the mortgages, regardless how sophisticated this might be, did not excuse the State from its duty to have a properly functioning judicial system.

In particular, the Tribunal found that the courts of Jalisco failed to function properly during the first instance, appeal and *amparo* proceedings. First, the commercial judge cancelled the mortgages by default as a result of a "deeply flawed" service of process to LMC, and later foreclosed the possibility to appeal said judgment in disregard of municipal law. Second, the higher courts during *amparo, queja* and remand proceedings, denied LMC every opportunity to allege and submit relevant and material evidence to prove the forgery that resulted in the loss of its investment.

The Tribunal concluded that LMC was denied procedural justice in three respects:

**a) LMC was denied access to justice**: LMC was never given the opportunity to defend itself in the Cancellation Proceeding, due to a "deeply flawed" service of process that resulted in the cancelation of its mortgages *in absentia*. While this was the basis of the denial of justice claim, it was not the only defective act. The Judge also failed to examine *ex officio* and exhaustibly, whether the service was properly performed, before declaring respondent *en rebeldía*. This omission was "shocking" in view of the implications at stake: the cancellation of multi-million dollar mortgages of a US-based company over well-known and highly valuable real estate, when the Judge had before him evidence that LMC was US-domiciled and incorporated in Canada. Moreover, this was exacerbated by the unusual swiftness of the Cancellation Proceeding (which lasted only 170 days). As the Tribunal put it, the Mexican judiciary never corrected this situation, despite LMC's multiple requests.

**b) LMC was denied the right to appeal**: A few weeks later, the same Judge arbitrarily precluded any opportunity of appeal, by giving a *res judicata* effect to its Cancellation Judgement (at the Debtor's request), which constituted a second denial of justice. By doing so, the Judge barred any possibility of LMC, once it became aware of the Cancellation Judgement, to lodge an appeal. The Judge based its declaration of *res judicata* on an inapplicable procedural rule under which low-amount disputes are not subject to appeal (i.e., lower than 500,000 MXP (USD 25,000). This decision was unjustified as the evidence before the Judge showed the mortgages (cancelled by him) secured US$ 32.8 million loans.

**c) LMC was denied the right to allege in *amparo* proceedings the "forgery" of the document upon which the mortgages were cancelled:** LMC tried in multiple occasions and under different motions – for 3 years – to bring the relevant evidence that could easily prove the illegality of the service and justify the annulment of the Cancellation Judgement. However, the Mexican courts consistently refused LMC's right to be heard and to present evidence, as follows:

i) *Ampliación de demanda*: A request to extend its *amparo* claim to include the highly relevant forgery was dismissed by the *amparo* court under the "wrong" argument that "*these acts have already been specified*" and failed to admit the key evidence.

ii) *Queja*: An incidental motion against the decision above, also rejected LMC's *ampliación de demanda* as inadmissible, alleging that it was not properly signed on LMC's behalf (as it should have been signed by LMC's legal representative and not by the attorney empowered to act on its behalf in the *amparo* proceedings). LMC was not even allowed to cure the alleged procedural defect (when it submitted a new power of attorney), despite the *ampliación de demanda* aimed at proving that LMC, an alien company operating in Mexico, had been the victim of an elaborate fraud.

iii)   *Incidente de falsedad de documento*: A separate motion to prove the forgery, was dismissed on the grounds that the allegedly false document was not related to the subject-matter of the *amparo* proceeding. As a result, the *amparo* court assumed the Settlement Agreement was valid and binding, thereby reducing the scope of the *amparo* to the question of whether the service of process had or not been properly executed in accordance with Mexican law. And – congruently with this reduced scope of investigation – all evidence in the file seeking to prove the forgery was eliminated.

iv) *Amparo*: Notwithstanding a previous finding by the *amparo* court that at least on one occasion LMC's signature had been forged (and that the Debtor was in prison for alleged forgeries of documents) the *amparo* judgement did not even discuss LMC's argument that the Settlement Agreement was also forged, since the *ampliación de demanda* had been dismissed. The *amparo* judgement consequently assumed that the Settlement Agreement was validly executed by LMC.

v) *Recurso de Revisión* (Remand *amparo*): finally, LMC sough the revocation of the *amparo* judgment for the same reason that the *amparo* court erroneously disregarded its claim that the Settlement Agreement had been forged as it considered "unrelated to the dispute". However, LMC was once again barred from claiming the forgery as expressly ordered by the *Queja* tribunal, which forbade the remand court to examine the issue.

**Conclusion**

As stated by the Tribunal, Mexican courts had four opportunities to address the question of the forgery of the Settlement Agreement but failed to do so. This constituted a denial of justice, by restricting its access to justice and its right to defend itself and present evidence. The Tribunal found that LMC had exhausted the reasonable available remedies that could have reversed the cancellation of the mortgages.

The implications of the LMC case may open new debates and may lead to the adoption of new approaches and decisions to contour the notion of denial of justice in the coming years.

Notably, in December 2020, Mexico received a notice of a new NAFTA legacy dispute alleging

denial of justice by the State courts' failure to recognise "mortgages" as collateral held by US creditors (AMERRA and JPMorgan) under insolvency proceedings. Another case initiated by US investors (B-Mex) in 2016, is calling a NAFTA tribunal to assess due process by Mexican *amparo* courts, as the investors claim they were "effectively and practically *denied* an appeal".

_____

*To make sure you do not miss out on regular updates from the Kluwer Arbitration Blog, please subscribe here. To submit a proposal for a blog post, please consult our Editorial Guidelines.*

**Profile Navigator and Relationship Indicator**
Includes 7,300+ profiles of arbitrators, expert witnesses, counsels & 13,500+ relationships to uncover potential conflicts of interest.

Learn how **Kluwer Arbitration** can support you.



References

**?1** *Lion Mexico Consolidated L.P. v. United Mexican States* (ICSID Case No. ARB(AF)/15/2).

**?2** In 1999, a NAFTA tribunal analysed and rejected for the first time a claim for denial of justice in *Robert Azinian v. Mexico.*

**?3** Decision on Jurisdiction, 30 July 2018, paras. 229, 233, 240.

**?4** Award, 20 September 2021, para. 299.

This entry was posted on Saturday, October 30th, 2021 at 8:54 am and is filed under Denial of justice, Due process, Investment Arbitration, Mexico, NAFTA

You can follow any responses to this entry through the Comments (RSS) feed. You can leave a response, or trackback from your own site.

# EXHIBIT G

WSJ FACULTY & STAFF MEMBERS

To keep your WSJ access, please sign in through your institution. If you do not sign in within the next thirty days, your account access will be deactivated. Sign In



This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/world/americas/mexican-tycoons-retail-chain-ordered-to-pay-1-billion-in-back-taxes-d7b6e565

**WORLD | AMERICAS**

# Mexican Tycoon's Retail Chain Ordered to Pay $1 Billion in Back Taxes

## Companies owned by billionaire Ricardo Salinas Pliego are fighting in court over some $3 billion in disputed taxes

*By Santiago Pérez* [Follow]

*Updated June 13, 2024 6:56 pm ET*



Grupo Salinas controls retailer Grupo Elektra, and Banco Azteca is the conglomerate's banking unit.
PHOTO: ALEJANDRO CEGARRA/BLOOMBERG NEWS

MEXICO CITY—The flagship company of Mexican billionaire Ricardo Salinas Pliego must pay about $1 billion in back taxes, a Mexico court said Thursday, the latest ruling in a series of legal battles over what tax authorities say are some $3 billion owed by his companies.

The court rejected an injunction sought by **Grupo Elektra** against the order to pay the $1 billion that tax authorities say the retailer owes. Grupo Salinas, the

conglomerate that controls Grupo Elektra, broadcaster TV Azteca and other companies, said Thursday that it will appeal the ruling, which is likely to reach the Supreme Court.

"We regret the lack of diligence and objectivity of some judges," the conglomerate said in a statement. Grupo Salinas said the judges have been pressured by the federal government.

Mexican President Andrés Manuel López Obrador has said that he urged Salinas Pliego to settle the tax disputes, which have spanned more than a decade, and even offered a discount of more than $400 million in back taxes.



Ricardo Salinas Pliego is one of Mexico's richest men. PHOTO: ALEJANDRO GUZMÁN/ZUMA PRESS

"We don't give in to extortion and that's why we don't accept any discounts," Salinas Pliego responded in a video recording in March.

The fight with Elektra over the payment of $1 billion in back taxes, plus interest, is the biggest of 17 tax disputes with firms owned by Salinas Pliego, authorities say.

Earlier this month, another court rejected a separate injunction filed by Grupo Elektra over more than $100 million in back taxes. The company reported $10 billion in sales last year.

Salinas Pliego, one of Mexico's richest men, is among the oligarchs who emerged in the 1990s when the government privatized state companies such as the television network he owns. He built a retail and banking empire and became a controversial figure in Mexico for playing hardball with authorities and using TV Azteca to discredit adversaries. He has skipped debt payments to U.S. bondholders for years.

In May, a U.S. federal indictment accused Rep. Henry Cuellar (D., Texas) of accepting $238,000 in bribes disguised as consulting fees from Banco Azteca,

the banking unit of Grupo Salinas, to further the bank's interests in Washington by influencing U.S. anti-money-laundering legislation. Neither Salinas Pliego nor his bank were charged with any wrongdoing.

A spokesman for Salinas Pliego said at the time that Grupo Salinas, like many other companies, lobbies "to safeguard the causes in which we believe and will always defend." Banco Azteca has the highest standards of compliance, he added.

Write to Santiago Pérez at santiago.perez@wsj.com

**Videos**

# EXHIBIT H

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/world/americas/the-mexican-bank-behind-alleged-bribes-to-a-texas-democrat-4cf4cc17

# Combative Billionaire's Bank Accused of Bribing a Texas Democrat

## U.S. federal indictment of congressman alleges payments from billionaire Ricardo Salinas Pliego's Banco Azteca were used to influence legislation

*By José de Córdoba* [Follow] *and Santiago Pérez* [Follow]

May 8, 2024 5:30 am ET

MEXICO CITY—Over three decades, Ricardo Salinas Pliego became one of Mexico's richest men with a mix of political connections and tough tactics. Now, his bank is at the center of a U.S. federal indictment accusing a Texas congressman of accepting bribes.

U.S. federal prosecutors say a Mexican bank channeled $238,000 in bribes disguised as consulting fees to Rep. Henry Cuellar (D., Texas) to further the bank's interests in Washington by influencing U.S. anti-money-laundering legislation, according to an indictment unsealed Friday in Houston. The lender in question was Salinas Pliego's Banco Azteca, according to a U.S. official.

Salinas Pliego is among the oligarchs who emerged in the 1990s, when Mexico sold off state companies to private investors. He built a retail and broadcasting empire that includes Banco Azteca focusing on low-income households, and developed a reputation as a combative businessman who isn't afraid to play rough with creditors, competitors and regulators.

Neither Salinas Pliego nor his bank were charged with any wrongdoing. Luciano Pascoe, a spokesman for Salinas Pliego's Grupo Salinas, which owns Banco Azteca among other companies, said Sunday on X that the conglomerate, like many other companies, lobbies "to safeguard the causes in which we believe and will always defend." Banco Azteca has the highest standards of compliance, he added.

Pascoe declined to comment further on the U.S. indictment.

Cuellar, who represents a district on the Texas-Mexico border, said he is innocent. He was released in Houston on Friday along with his wife, Imelda Cuellar, after each paid an

unsecured $100,000 bond. The indictment also charges Cuellar with receiving $360,000 in bribes from an Azerbaijani state oil company for helping to advance the interests of the government of Azerbaijan.



Rep. Henry Cuellar denied wrongdoing after he was charged with accepting bribes. PHOTO: MICHAEL MCCOY/REUTERS

Salinas Pliego is a controversial figure in Mexico, where he is mired in tax disputes with the government over billions of dollars and has skipped debt payments to U.S. bondholders for years. He has used his television network to discredit adversaries, and has waged protracted courtroom battles with authorities and former partners such as General Electric.

Salinas Pliego once dispatched a squad of armed private security guards in the middle of the night to seize control of a TV station he claimed to own. His broadcaster, TV Azteca, said at the time that it hadn't used violence and was "exercising its rights and in full compliance with the law."

Banco Azteca, Mexico's 10th-largest bank by assets, struggled with strict U.S. anti-money-laundering regulations, which had made it difficult for the bank to develop correspondent-banking relationships with American institutions that facilitate cross-border transactions in dollars, including large amounts of cash. Multiple U.S. banks had cut ties with Banco Azteca because of risk and compliance concerns linked to those regulations.

Pascoe said Sunday that the lack of correspondent banking affects millions of Mexicans who receive dollars from relatives abroad, make a living from tourism, or trade on the U.S.-Mexico border.

According to the indictment, Cuellar agreed to advance the interests of Banco Azteca in exchange for monthly payments of thousands of dollars to his wife via shell companies. It included writing language into legislation that favored the bank. In 2016, Cuellar "pressured" a high-ranking U.S. official who supervised banks to take actions that benefited the bank, the indictment said.



Banco Azteca is Mexico's 10th largest bank by assets. PHOTO: CESAR RODRIGUEZ/BLOOMBERG NEWS

The indictment said the bank's vice chairman, who wasn't named, helped to coordinate the alleged bribe payments and reviewed draft banking legislation shared by Cuellar.

Cuellar kept the senior Banco Azteca executive abreast of legislation and other banking matters in Washington, the indictment said. In one email to the bank executive, Cuellar took credit for influencing the U.S. official's approach to correspondent banks.

In another email, Cuellar said he had successfully inserted language in a bill to address Banco Azteca's concerns, according to the indictment. "Language added in committee," wrote Cuellar. "Great news," responded the bank executive.

In 2005, Salinas Pliego was charged by the Securities and Exchange Commission with illegally trading in the discounted debt of a TV Azteca unit. That deal netted him a $109 million windfall profit at the expense of other shareholders, the SEC said. He was barred from serving as an executive or director of any publicly listed American company for five years. He settled the charges with the SEC without admitting or denying any misconduct after paying $8.5 million in penalties against him and another senior company executive.

In the late 2000s, Salinas Pliego used shell companies to gain control of struggling fertilizer producer Fertinal from a Mexican government agency at a discount. A decade later, after

Fertinal had been loaded with high-interest loans from Banco Azteca, Mexico's state-run oil firm, Pemex, acquired the fertilizer company for $635 million, a price that a government auditor later said inflated Fertinal's equity value by nearly $200 million. Salinas Pliego denied wrongdoing.



TV Azteca headquarters in Mexico City. PHOTO: JEOFFREY GUILLEMARD/BLOOMBERG NEWS

Salinas Pliego has built a following of 1.8 million people on X, where he blasts Mexico's leftist government, insults officials and legislators as "gobernícolas," or government cave men, and posts videos of himself traveling in his helicopter, sitting in his private jet, or smoking cigars on his megayacht, the Lady Moura, which he said he bought for $150 million.

Many of his followers call him Tío Richie, or Uncle Richie. Last year, Salinas Pliego held a contest "Win with Tío Richie" to celebrate TV Azteca's 30th anniversary, where he gave away prizes, including a luxury home, to contestants.

The businessman, who at first was close to nationalist President Andrés Manuel López Obrador, now accuses Mexican tax authorities of extorting businesses by doubling or tripling the amount of taxes owed and then offering discounts.

"I personally pay an obscene amount of taxes, as do my companies," Salinas Pliego said in a video recording posted on X. "We will not give in to any extortion."

At the same time, Salinas Pliego and López Obrador traded barbs over a golf course on federal lands that the businessman operated in the beach resort of Huatulco. In February, National Guard soldiers took control after the government revoked Salinas Pliego's operating license and reclassified the land as a national park.

"I will not concede to this vision of wanting to take from the rich to give to the poor because, in addition to being illegal and immoral, it's an exercise in arrogance," Salinas Pliego wrote on X.

—*Sadie Gurman contributed to this article.*

Write to José de Córdoba at jose.decordoba@wsj.com and Santiago Pérez at santiago.perez@wsj.com

*Appeared in the May 10, 2024, print edition as 'Mexican Bank Is Linked To Alleged Cuellar Bribes'.*

# EXHIBIT I



RATING ACTION COMMENTARY

# Fitch Downgrades Banco Azteca's IDRs to 'BB-'; Outlook Stable

Mon 25 Mar, 2024 - 6:13 PM ET

Fitch Ratings - Monterrey - 25 Mar 2024: Fitch Ratings has downgraded Banco Azteca, S.A. Institucion de Banca Multiple's (Banco Azteca) Viability Rating (VR) to 'bb-' from 'bb', its Long-Term Foreign and Local Currency Issuer Default Ratings (IDRs) to 'BB-' from 'BB' and its National Long-Term Rating to 'A(mex)' from 'A+(mex)'. The Rating Outlooks for the Long-Term IDRs and National Rating are Stable.

The Short-Term Foreign and Local Currency IDRs and National Short-Term Rating were affirmed at 'B' and 'F1+(mex)', respectively. The 'F1+(mex)' Short-Term National Rating is the higher of two possible options corresponding to the 'A(mex)' Long-Term National Rating, and reflects Fitch's opinion about the bank's good funding and liquidity profiles. The government support rating (GSR) was also affirmed at 'bb-'.

The downgrade follows the heightened risks Banco Azteca is assuming by the weak corporate governance practices of its controlling group and the sustained high related-party commercial loans at the bank. Fitch also considers the deteriorated bank's risk profile as a result of the riskier underwriting standards in its commercial portfolio with high concentration per individual borrower that has influenced its financial performance in the last two years.

## KEY RATING DRIVERS

**ESG Governance Structure:** Fitch has revised the ESG Relevance Score of Governance Structure to '5' from '4' as high related-party loans weigh relevantly in Banco Azteca's ratings. The bank's IDRs and national scale ratings are driven by the bank's stand-alone

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

However, Fitch adjusted downwards the score of the BP to 'bb' with a negative trend from 'bb+' stable, as corporate governance practices around its controlling group has increased the bank's risks that to some extent are limiting its financial performance.

The negative trend reflects that the BP score could continue with downward adjustments if corporate governance practices further impact the bank's financial performance. In the past months a relevant related-party transaction deteriorated and required and will continue to require the bank additional loan loss allowances (LLAs). At YE23, related-party loans represented 28.2% the bank's common equity Tier 1 (CET1), level that Fitch considers high and that differs from best international practices.

**Systemic Importance Limits Further IDRs Downgrades:** Banco Azteca's IDRs are at the same level of the bank's GSR at 'bb-'. Fitch considers the bank's good market position and relevant role of providing financial services to an ample share of the population will drive the government support in case of need and limit future IDR downgrades beyond 'BB-'.

That is if Banco Azteca's VR is downgraded to 'b+' or below, the IDRs and national ratings would be driven by the GSR considering the 'Higher Of' approach about Fitch's perception of the government support that the bank could receive, if need arises. As of November 2023, Banco Azteca's deposits were about 2.9% of the Mexican banking system; while it had a 7.9% share in the consumer lending segment. In both figures it ranked eighth and fifth, respectively.

**Asset Quality Pressured by Credit Concentrations:** Fitch considers the ample experience and long track record in its core business line, which is mainly focused on middle- to low-income customers. Banco Azteca has been handling well its core business under the high inflationary environment despite its more sensitive business focus on low income individuals. However, Banco Azteca's commercial loan portfolio underwriting standards continue to add pressure on its asset quality.

At YE23, Stage 3 loans to total loans ratio decreased to 4.2% from 5.3% in 3Q23, although write-offs increased compared to 2022 (+47.3%) partly by the above mentioned deteriorated related party loan. At the same date, the adjusted impaired loan ratio as calculated per Fitch (Stage 3 loans plus write-offs in the last 12 months) was 12.7% (YE22: 10.3%). The top 20 borrowers represented 1.5x CET1, while five represented more than

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

by both, from its core business and commercial loans. This, despite the bank had additional LLAs. At YE23, LICs increased 35.5% compared to YE22 and losses from loan portfolio sales also weigh on the bank's recent profitability metrics. At YE23, the operating profit to risk-weighted assets (RWA) ratio was 1.8% (YE22: 1.7%), while LICs to pre-impairment operating profit ratio rose to 80.8% from 77.3% in 2022. Fitch considers the bank's profitability performance lags from the Mexican commercial banking system and will remain sensitive to asset quality pressures.

**Reasonable Capitalization:** Capitalization levels of Banco Azteca remain reasonable with a CET1 to RWA ratio of 14.5%, above 13.7% at YE22. During the second half of 2023, the bank's core capitalization ratio was supported by a capital injection of MXN1.05 billion from its shareholder (Grupo Elektra, S. A. B. de C. V., rated by Fitch at BB-/Stable), as well as due to better efficiencies in RWA accounting through models approved by the local regulator. Fitch expects CET1 ratio may be pressured by the continued growth of its loan portfolio and credit concentrations, although it will remain at levels close to 14% and supported by consistent reinvestment of earnings.

**Good Funding and Liquidity Position:** Fitch considers the bank's funding and liquidity position to be its main financial strength, as it has an ample, diversified and low-cost customer deposit franchise with proven stability through the economic cycle. At YE23, customer deposits represented 88.0% of total non-equity funding and were mainly composed of demand deposits (YE23: 76.8% of total customer deposits).

At the same date, the loans to deposits ratio was 79.0%, slightly affected with respect to YE22 and this was mainly explained by a higher credit growth, although the core metric is still at levels that compares favorably with peers. Liquidity coverage ratio and net stable funding ratio remain at sustained levels above the regulatory minimum.

## RATING SENSITIVITIES

### Factors that Could, Individually or Collectively, Lead to Negative Rating Action/Downgrade

--Banco Azteca's VR could be downgraded if the financial profile materially weakens due to asset quality deterioration resulting in an operating profit to RWA metric consistently below 1.25% and the a CET1 to RWA ratio sustained below 11%. This deterioration must be

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

--Banco Azteca's IDRs and National Ratings further downgrades are limited due to Fitch's appreciation of government support in case of need it.

**Factors that Could, Individually or Collectively, Lead to Positive Rating Action/Upgrade**

--Banco Azteca's IDRs, VR and National Ratings could be upgraded by Fitch's appreciation of a reduced risk appetite in its commercial loan portfolio, in addition to consistently deliver operating profit to RWA ratio above 2% and CET1 to RWA ratio above 17%;

--Strengthening of corporate governance practices of Banco Azteca's controlling group that eases Fitch's concerns of reputational risks could also led to an upgrade.

**Government Support Rating (GSR):** Banco Azteca 'bb-' GSR reflects Fitch's expectation that although the bank is not a domestic systemically important bank (D-SIB), there is moderate probability of sovereign support in case of need, given the bank's ample base of retail depositors and moderate market share of customer deposits.

**Factors that could, individually or collectively, lead to negative rating action/downgrade:**

--The GSR could be downgraded if Fitch believes that the government's propensity to support the bank has declined due to reasons such as a material loss in the market share of retail customer deposits.

**Factors that could, individually or collectively, lead to positive rating action/upgrade:**

--Upside potential for Banco Azteca's GSR is limited and could only occur over time with a material gain in the bank's systemic importance.

**VR ADJUSTMENTS**

Fitch has assigned a Business Profile score of 'bb', which is below the 'bbb' category implied score, due to the following adjustment reason(s): Management and Governance (negative).

Fitch has assigned an Asset Quality score of 'b+', which is below the 'bb' category implied score, due to the following adjustment reason(s): Concentrations (negative).

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

Fitch classified pre-paid expenses and other deferred assets as intangibles and deducted from total equity due to the low loss absorption capacity under stress of these assets.

**Sources of Information**

The principal sources of information used in the analysis are described in the Applicable Criteria.

Financial figures are in accordance to the Comision Nacional Bancaria y de Valores criteria. Figures for 2022 and 2023 include recent accounting changes in the process to converge to International Financial Reporting Standards. Prior years did not include these changes and Fitch believes they are not directly comparable.

**REFERENCES FOR SUBSTANTIALLY MATERIAL SOURCE CITED AS KEY DRIVER OF RATING**

The principal sources of information used in the analysis are described in the Applicable Criteria.

**ESG CONSIDERATIONS**

Fitch has revised Banco Azteca's ESG Relevance Score of Governance Structure to '5' from '4' due to the corporate governance concerns and the relevant related-party transactions. This has a negative impact on the credit profile, and is relevant to the ratings in conjunction with other factors.

The highest level of ESG credit relevance is a score of '3', unless otherwise disclosed in this section. A score of '3' means ESG issues are credit-neutral or have only a minimal credit impact on the entity, either due to their nature or the way in which they are being managed by the entity. Fitch's ESG Relevance Scores are not inputs in the rating process; they are an observation on the relevance and materiality of ESG factors in the rating decision. For more information on Fitch's ESG Relevance Scores, visit www.fitchratings.com/topics/esg/products#esg-relevance-scores.

**RATING ACTIONS**

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

| Banco Azteca, S.A. | | | |
|---|---|---|---|
| | LT IDR | BB- Rating Outlook Stable Downgrade | BB Rating Outlook Stable |
| | ST IDR | B   Affirmed | B |
| | LC LT IDR | BB- Rating Outlook Stable Downgrade | BB Rating Outlook Stable |
| | LC ST IDR | B   Affirmed | B |
| | Natl LT | A(mex) Rating Outlook Stable Downgrade | A+ (mex) Rating Outlook Stable |
| | Natl ST | F1+(mex)   Affirmed | F1+(mex) |
| | Viability | bb-   Downgrade | bb |
| | Government Support | bb-   Affirmed | bb- |

**VIEW ADDITIONAL RATING DETAILS**

## FITCH RATINGS ANALYSTS

**Benjamin Ortiz**

Senior Analyst

Primary Rating Analyst

+52 81 4161 7065

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

**German Valle Mendoza, CFA**
Director
Secondary Rating Analyst
+52 81 4161 7016
german.valle@fitchratings.com

**Monica Ibarra Garcia**
Senior Director
Committee Chairperson
+52 81 4161 7050
monica.ibarragarcia@fitchratings.com

## MEDIA CONTACTS

**Elizabeth Fogerty**
New York
+1 212 908 0526
elizabeth.fogerty@thefitchgroup.com

Additional information is available on www.fitchratings.com

## PARTICIPATION STATUS

The rated entity (and/or its agents) or, in the case of structured finance, one or more of the transaction parties participated in the rating process except that the following issuer(s), if any, did not participate in the rating process, or provide additional information, beyond the issuer's available public disclosure.

## APPLICABLE CRITERIA

National Scale Rating Criteria (pub. 22 Dec 2020)

Metodología de Calificaciones en Escala Nacional (pub. 22 Dec 2020)

Metodología de Calificación de Bancos – Efectiva del 28 de marzo de 2022 al 27 de septiembre de 2023 (pub. 28 Mar 2022)

Bank Rating Criteria (pub. 15 Mar 2024) (including rating assumption sensitivity)

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

Solicitation Status

Endorsement Policy

**ENDORSEMENT STATUS**

Banco Azteca, S.A.                                        EU Endorsed, UK Endorsed

**DISCLAIMER & DISCLOSURES**

All Fitch Ratings (Fitch) credit ratings are subject to certain limitations and disclaimers. Please read these limitations and disclaimers by following this link: https://www.fitchratings.com/understandingcreditratings. In addition, the following https://www.fitchratings.com/rating-definitions-document details Fitch's rating definitions for each rating scale and rating categories, including definitions relating to default. ESMA and the FCA are required to publish historical default rates in a central repository in accordance with Articles 11(2) of Regulation (EC) No 1060/2009 of the European Parliament and of the Council of 16 September 2009 and The Credit Rating Agencies (Amendment etc.) (EU Exit) Regulations 2019 respectively.

Published ratings, criteria, and methodologies are available from this site at all times. Fitch's code of conduct, confidentiality, conflicts of interest, affiliate firewall, compliance, and other relevant policies and procedures are also available from the Code of Conduct section of this site. Directors and shareholders' relevant interests are available at https://www.fitchratings.com/site/regulatory. Fitch may have provided another permissible or ancillary service to the rated entity or its related third parties. Details of permissible or ancillary service(s) for which the lead analyst is based in an ESMA- or FCA-registered Fitch Ratings company (or branch of such a company) can be found on the entity summary page for this issuer on the Fitch Ratings website.

In issuing and maintaining its ratings and in making other reports (including forecast information), Fitch relies on factual information it receives from issuers and underwriters and from other sources Fitch believes to be credible. Fitch conducts a reasonable investigation of the factual information relied upon by it in accordance with its ratings methodology, and obtains reasonable verification of that information from independent sources, to the extent such sources are available for a given security or in a given jurisdiction. The manner of Fitch's factual investigation and the scope of the third-party

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

third-party verifications such as audit reports, agreed-upon procedures letters, appraisals, actuarial reports, engineering reports, legal opinions and other reports provided by third parties, the availability of independent and competent third- party verification sources with respect to the particular security or in the particular jurisdiction of the issuer, and a variety of other factors. Users of Fitch's ratings and reports should understand that neither an enhanced factual investigation nor any third-party verification can ensure that all of the information Fitch relies on in connection with a rating or a report will be accurate and complete. Ultimately, the issuer and its advisers are responsible for the accuracy of the information they provide to Fitch and to the market in offering documents and other reports. In issuing its ratings and its reports, Fitch must rely on the work of experts, including independent auditors with respect to financial statements and attorneys with respect to legal and tax matters. Further, ratings and forecasts of financial and other information are inherently forward-looking and embody assumptions and predictions about future events that by their nature cannot be verified as facts. As a result, despite any verification of current facts, ratings and forecasts can be affected by future events or conditions that were not anticipated at the time a rating or forecast was issued or affirmed. Fitch Ratings makes routine, commonly-accepted adjustments to reported financial data in accordance with the relevant criteria and/or industry standards to provide financial metric consistency for entities in the same sector or asset class.

The complete span of best- and worst-case scenario credit ratings for all rating categories ranges from 'AAA' to 'D'. Fitch also provides information on best-case rating upgrade scenarios and worst-case rating downgrade scenarios (defined as the 99th percentile of rating transitions, measured in each direction) for international credit ratings, based on historical performance. A simple average across asset classes presents best-case upgrades of 4 notches and worst-case downgrades of 8 notches at the 99th percentile. For more details on sector-specific best- and worst-case scenario credit ratings, please see Best- and Worst-Case Measures under the Rating Performance page on Fitch's website.

The information in this report is provided "as is" without any representation or warranty of any kind, and Fitch does not represent or warrant that the report or any of its contents will meet any of the requirements of a recipient of the report. A Fitch rating is an opinion as to the creditworthiness of a security. This opinion and reports made by Fitch are based on established criteria and methodologies that Fitch is continuously evaluating and updating.

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

shared authorship. Individuals identified in a Fitch report were involved in, but are not solely responsible for, the opinions stated therein. The individuals are named for contact purposes only. A report providing a Fitch rating is neither a prospectus nor a substitute for the information assembled, verified and presented to investors by the issuer and its agents in connection with the sale of the securities. Ratings may be changed or withdrawn at any time for any reason in the sole discretion of Fitch. Fitch does not provide investment advice of any sort. Ratings are not a recommendation to buy, sell, or hold any security. Ratings do not comment on the adequacy of market price, the suitability of any security for a particular investor, or the tax-exempt nature or taxability of payments made in respect to any security. Fitch receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating securities. Such fees generally vary from US$1,000 to US$750,000 (or the applicable currency equivalent) per issue. In certain cases, Fitch will rate all or a number of issues issued by a particular issuer, or insured or guaranteed by a particular insurer or guarantor, for a single annual fee. Such fees are expected to vary from US$10,000 to US$1,500,000 (or the applicable currency equivalent). The assignment, publication, or dissemination of a rating by Fitch shall not constitute a consent by Fitch to use its name as an expert in connection with any registration statement filed under the United States securities laws, the Financial Services and Markets Act of 2000 of the United Kingdom, or the securities laws of any particular jurisdiction. Due to the relative efficiency of electronic publishing and distribution, Fitch research may be available to electronic subscribers up to three days earlier than to print subscribers.

For Australia, New Zealand, Taiwan and South Korea only: Fitch Australia Pty Ltd holds an Australian financial services license (AFS license no. 337123) which authorizes it to provide credit ratings to wholesale clients only. Credit ratings information published by Fitch is not intended to be used by persons who are retail clients within the meaning of the Corporations Act 2001.Fitch Ratings, Inc. is registered with the U.S. Securities and Exchange Commission as a Nationally Recognized Statistical Rating Organization (the "NRSRO"). While certain of the NRSRO's credit rating subsidiaries are listed on Item 3 of Form NRSRO and as such are authorized to issue credit ratings on behalf of the NRSRO (see https://www.fitchratings.com/site/regulatory), other credit rating subsidiaries are not listed on Form NRSRO (the "non-NRSROs") and therefore credit ratings issued by those subsidiaries are not issued on behalf of the NRSRO. However, non-NRSRO personnel may participate in determining credit ratings issued by or on behalf of the NRSRO.

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

Copyright © 2024 by Fitch Ratings, Inc., Fitch Ratings Ltd. and its subsidiaries. 33 Whitehall Street, NY, NY 10004. Telephone: 1-800-753-4824, (212) 908-0500. Reproduction or retransmission in whole or in part is prohibited except by permission. All rights reserved.

READ LESS

## SOLICITATION STATUS

The ratings above were solicited and assigned or maintained by Fitch at the request of the rated entity/issuer or a related third party. Any exceptions follow below.

## ENDORSEMENT POLICY

Fitch's international credit ratings produced outside the EU or the UK, as the case may be, are endorsed for use by regulated entities within the EU or the UK, respectively, for regulatory purposes, pursuant to the terms of the EU CRA Regulation or the UK Credit Rating Agencies (Amendment etc.) (EU Exit) Regulations 2019, as the case may be. Fitch's approach to endorsement in the EU and the UK can be found on Fitch's Regulatory Affairs page on Fitch's website. The endorsement status of international credit ratings is provided within the entity summary page for each rated entity and in the transaction detail pages for structured finance transactions on the Fitch website. These disclosures are updated on a daily basis.

We use cookies to deliver our online services, to understand how they are used and for advertising purposes. Details of the cookies we use and instructions on how to disable them are set out in our Privacy Policy.

# EXHIBIT J

An official website of the United States Government Here's how you know

Home >  ...  > Internet Freedom and Technology and Human Rig...

# Internet Freedom and Technology and Human Rights

BUREAU OF DEMOCRACY, HUMAN RIGHTS, AND LABOR

Intrinsic to the concept of Internet freedom is recognition that human rights and fundamental freedoms must be protected both online and offline. Just as people must be able to exercise their rights to freedoms of expression, association, religion or belief, and peaceful assembly offline, they must also be able to exercise these same rights online.

We promote Internet access for all and the design, development, governance, and use of digital technologies in a manner that supports democratic values and institutions, advances societal and economic progress, and protects and promotes human rights. At the same time, we seek to counter the misuse of digital technologies to repress, control, divide, discriminate, and/or disenfranchise. In doing so, we work on policy and programming related to a multitude of technologies, including surveillance technologies, artificial intelligence (AI), anti-censorship tools, and blockchain.

**Our Approach**

We advance these priorities globally through a multifaceted approach that combines bilateral diplomacy, engagement in multilateral and multi-stakeholder fora, and funding to civil society-led policy and advocacy projects.

**Bilateral Engagement:** We engage with our government counterparts in other countries, informed by the perspectives of multi-stakeholders, such as civil society and industry, on

laws, policies, and activities that impact human rights online and work to elevate concerns through appropriate channels and public diplomacy.

**Multilateral and Multi-Stakeholder Engagement:** Working through multilateral and multistakeholder bodies – with civil society organizations and the private sector – we aim to advance norms, rules, and approaches so technology is developed and used in ways that reflect democratic values and ensures all people everywhere have access to an Internet that is open, global, interoperable, reliable, and secure. We also engage in international standards setting bodies to ensure that international technology standards are developed with respect for privacy and the protection of human rights. Our efforts include engagement in groups such as the:

- **Freedom Online Coalition**
- U.S.-E.U. Trade and Technology Council
- United Nations
- Organization for Economic Cooperation and Development (OECD)
- G-7
- G-20
- **The Council of Europe's Framework Convention on Artificial Intelligence and Human Rights, Democracy, and the Rule of Law**

**Programming:** Since 2008, the Department has invested over $320 million in global Internet freedom programs, which support digital safety, policy advocacy, technology, and research to help global Internet users overcome barriers to accessing the open Internet. Department programs support leading anti-censorship tools that allow millions of Internet users worldwide to safely connect to the uncensored Internet, which helps to:

- Advance U.S. business opportunities abroad,
- Foster the free flow of information across borders,
- Counter political repression around the world, and
- Protect journalists and activists operating in repressive environments from online censorship and malicious cyber activity.

**TAGS**

Bureau of Democracy, Human Rights, and Labor      Human Rights      Internet Freedom

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

# EXHIBIT K

You are viewing:

# **ARCHIVED** CONTENT

Information released online from January 20, 2009 to January 20, 2017.

**NOTE:** Content in this archive site is **NOT UPDATED**, and links may not function. External links to other Internet sites should not be construed as an endorsement of the views contained therein.

Go to the current State.gov website for up-to-date information. (http://www.state.gov/)

# U.S. Department of State
## Diplomacy in Action

## Remarks on Internet Freedom

Remarks

Hillary Rodham Clinton

Secretary of State

The Newseum

Washington, DC

January 21, 2010

---

**Transcripts:** Arabic (//2009-2017.state.gov/documents/organization/135875.pdf) | Chinese (//2009-2017.state.gov/documents/organization/135876.pdf)| French (//2009-2017.state.gov/documents/organization/135879.pdf)| Persian (//2009-2017.state.gov/documents/organization/135877.pdf) | Russian (//2009-2017.state.gov/documents/organization/135878.pdf) | Spanish (//2009-2017.state.gov/documents/organization/135880.pdf) | Urdu (//2009-2017.state.gov/documents/organization/135881.pdf)

**SECRETARY CLINTON:** Thank you very much, Alberto, for not only that kind introduction but your and your colleagues' leadership of this important institution. It's a pleasure to be here at the Newseum. The Newseum is a monument to some of our most precious freedoms, and I'm grateful for this opportunity to discuss how those freedoms apply to the challenges of the 21st

century.

Although I can't see all of you because in settings like this, the lights are in my eyes and you are in the dark, I know that there are many friends and former colleagues. I wish to acknowledge Charles Overby, the CEO of Freedom Forum here at the Newseum; Senator Edward Kaufman and Senator Joe Lieberman, my former colleagues in the Senate, both of whom worked for passage of the Voice Act, which speaks to Congress's and the American people's commitment to internet freedom, a commitment that crosses party lines and branches of government.

Also, I'm told here as well are Senator Sam Brownback, Senator Ted Kaufman, Representative Loretta Sanchez, many representatives of the Diplomatic Corps, ambassadors, chargés, participants in our International Visitor Leadership Program on internet freedom from China, Colombia, Iran, and Lebanon, and Moldova. And I also want to acknowledge Walter Isaacson, president of the Aspen Institute, recently named to our Broadcasting Board of Governors and, of course, instrumental in supporting the work on internet freedom that the Aspen Institute has been doing.

This is an important speech on a very important subject. But before I begin, I want to just speak briefly about Haiti, because during the last eight days, the people of Haiti and the people of the world have joined together to deal with a tragedy of staggering proportions. Our hemisphere has seen its share of hardship, but there are few precedents for the situation we're facing in Port-au-Prince. Communication networks have played a critical role in our response. They were, of course, decimated and in many places totally destroyed. And in the hours after the quake, we worked with partners in the private sector; first, to set up the text "HAITI" campaign so that mobile phone users in the United States could donate to relief efforts via text messages. That initiative has been a showcase for the generosity of the American people, and thus far, it's raised over $25 million for recovery efforts.

Information networks have also played a critical role on the ground. When I was with President Preval in Port-au-Prince on Saturday, one of his top priorities was to try to get communication up and going. The government couldn't talk to each other, what was left of it, and NGOs, our civilian leadership, our military leadership were severely impacted. The technology community has set up interactive maps to help us identify needs and target resources. And on Monday, a seven-year-old girl and two women were pulled from the rubble of a collapsed supermarket by an American search-and-rescue team after they sent a text message calling for help. Now, these examples are manifestations of a much broader phenomenon.

The spread of information networks is forming a new nervous system for our planet. When something happens in Haiti or Hunan, the rest of us learn about it in real time — from real people. And we can respond in real time as well. Americans eager to help in the aftermath of a disaster and the girl trapped in the supermarket are connected in ways that were not even imagined a year ago, even a generation ago. That same principle applies to almost all of humanity today. As we sit here, any of you — or maybe more likely, any of our children — can take out the tools that many carry every day and transmit this discussion to billions across the world.

Now, in many respects, information has never been so free. There are more ways to spread more ideas to more people than at any moment in history. And even in authoritarian countries, information networks are helping people discover new facts and making governments more accountable.

During his visit to China in November, for example, President Obama held a town hall meeting with an online component to highlight the importance of the internet. In response to a question that was sent in over the internet, he defended the right of people to freely access information, and said that the more freely information flows, the stronger societies become. He spoke about how access to information helps citizens hold their own governments accountable, generates new ideas, encourages creativity and entrepreneurship. The United States belief in that ground truth is what brings me here today.

Because amid this unprecedented surge in connectivity, we must also recognize that these technologies are not an unmitigated

blessing. These tools are also being exploited to undermine human progress and political rights. Just as steel can be used to build hospitals or machine guns, or nuclear power can either energize a city or destroy it, modern information networks and the technologies they support can be harnessed for good or for ill. The same networks that help organize movements for freedom also enable al-Qaida to spew hatred and incite violence against the innocent. And technologies with the potential to open up access to government and promote transparency can also be hijacked by governments to crush dissent and deny human rights.

In the last year, we've seen a spike in threats to the free flow of information. China, Tunisia, and Uzbekistan have stepped up their censorship of the internet. In Vietnam, access to popular social networking sites has suddenly disappeared. And last Friday in Egypt, 30 bloggers and activists were detained. One member of this group, Bassem Samir, who is thankfully no longer in prison, is with us today. So while it is clear that the spread of these technologies is transforming our world, it is still unclear how that transformation will affect the human rights and the human welfare of the world's population.

On their own, new technologies do not take sides in the struggle for freedom and progress, but the United States does. We stand for a single internet where all of humanity has equal access to knowledge and ideas. And we recognize that the world's information infrastructure will become what we and others make of it. Now, this challenge may be new, but our responsibility to help ensure the free exchange of ideas goes back to the birth of our republic. The words of the First Amendment to our Constitution are carved in 50 tons of Tennessee marble on the front of this building. And every generation of Americans has worked to protect the values etched in that stone.

Franklin Roosevelt built on these ideas when he delivered his Four Freedoms speech in 1941. Now, at the time, Americans faced a cavalcade of crises and a crisis of confidence. But the vision of a world in which all people enjoyed freedom of expression, freedom of worship, freedom from want, and freedom from fear transcended the troubles of his day. And years later, one of my heroes, Eleanor Roosevelt, worked to have these principles adopted as a cornerstone of the Universal Declaration of Human Rights. They have provided a lodestar to every succeeding generation, guiding us, galvanizing us, and enabling us to move forward in the face of uncertainty.

So as technology hurtles forward, we must think back to that legacy. We need to synchronize our technological progress with our principles. In accepting the Nobel Prize, President Obama spoke about the need to build a world in which peace rests on the inherent rights and dignities of every individual. And in my speech on human rights at Georgetown a few days later, I talked about how we must find ways to make human rights a reality. Today, we find an urgent need to protect these freedoms on the digital frontiers of the 21st century.

There are many other networks in the world. Some aid in the movement of people or resources, and some facilitate exchanges between individuals with the same work or interests. But the internet is a network that magnifies the power and potential of all others. And that's why we believe it's critical that its users are assured certain basic freedoms. Freedom of expression is first among them. This freedom is no longer defined solely by whether citizens can go into the town square and criticize their government without fear of retribution. Blogs, emails, social networks, and text messages have opened up new forums for exchanging ideas, and created new targets for censorship.

As I speak to you today, government censors somewhere are working furiously to erase my words from the records of history. But history itself has already condemned these tactics. Two months ago, I was in Germany to celebrate the 20th anniversary of the fall of the Berlin Wall. The leaders gathered at that ceremony paid tribute to the courageous men and women on the far side of that barrier who made the case against oppression by circulating small pamphlets called samizdat. Now, these leaflets questioned the claims and intentions of dictatorships in the Eastern Bloc and many people paid dearly for distributing them. But their words helped pierce the concrete and concertina wire of the Iron Curtain.

The Berlin Wall symbolized a world divided and it defined an entire era. Today, remnants of that wall sit inside this museum where they belong, and the new iconic infrastructure of our age is the internet. Instead of division, it stands for connection. But even as networks spread to nations around the globe, virtual walls are cropping up in place of visible walls.

Some countries have erected electronic barriers that prevent their people from accessing portions of the world's networks. They've expunged words, names, and phrases from search engine results. They have violated the privacy of citizens who engage in non-violent political speech. These actions contravene the Universal Declaration on Human Rights, which tells us that all people have the right "to seek, receive and impart information and ideas through any media and regardless of frontiers." With the spread of these restrictive practices, a new information curtain is descending across much of the world. And beyond this partition, viral videos and blog posts are becoming the samizdat of our day.

As in the dictatorships of the past, governments are targeting independent thinkers who use these tools. In the demonstrations that followed Iran's presidential elections, grainy cell phone footage of a young woman's bloody murder provided a digital indictment of the government's brutality. We've seen reports that when Iranians living overseas posted online criticism of their nation's leaders, their family members in Iran were singled out for retribution. And despite an intense campaign of government intimidation, brave citizen journalists in Iran continue using technology to show the world and their fellow citizens what is happening inside their country. In speaking out on behalf of their own human rights, the Iranian people have inspired the world. And their courage is redefining how technology is used to spread truth and expose injustice.

Now, all societies recognize that free expression has its limits. We do not tolerate those who incite others to violence, such as the agents of al-Qaida who are, at this moment, using the internet to promote the mass murder of innocent people across the world. And hate speech that targets individuals on the basis of their race, religion, ethnicity, gender, or sexual orientation is reprehensible. It is an unfortunate fact that these issues are both growing challenges that the international community must confront together. And we must also grapple with the issue of anonymous speech. Those who use the internet to recruit terrorists or distribute stolen intellectual property cannot divorce their online actions from their real world identities. But these challenges must not become an excuse for governments to systematically violate the rights and privacy of those who use the internet for peaceful political purposes.

The freedom of expression may be the most obvious freedom to face challenges with the spread of new technologies, but it is not the only one. The freedom of worship usually involves the rights of individuals to commune or not commune with their Creator. And that's one channel of communication that does not rely on technology. But the freedom of worship also speaks to the universal right to come together with those who share your values and vision for humanity. In our history, those gatherings often took place in churches, synagogues, mosques and temples. Today, they may also take place on line.

The internet can help bridge divides between people of different faiths. As the President said in Cairo, freedom of religion is central to the ability of people to live together. And as we look for ways to expand dialogue, the internet holds out such tremendous promise. We've already begun connecting students in the United States with young people in Muslim communities around the world to discuss global challenges. And we will continue using this tool to foster discussion between individuals from different religious communities.

Some nations, however, have co-opted the internet as a tool to target and silence people of faith. Last year, for example, in Saudi Arabia, a man spent months in prison for blogging about Christianity. And a Harvard study found that the Saudi Government blocked many web pages about Hinduism, Judaism, Christianity, and even Islam. Countries including Vietnam and China employed similar tactics to restrict access to religious information.

Now, just as these technologies must not be used to punish peaceful political speech, they must also not be used to persecute or silence religious minorities. Now, prayers will always travel on higher networks. But connection technologies like the internet and

social networking sites should enhance individuals' ability to worship as they see fit, come together with people of their own faith, and learn more about the beliefs of others. We must work to advance the freedom of worship online just as we do in other areas of life.

There are, of course, hundreds of millions of people living without the benefits of these technologies. In our world, as I've said many times, talent may be distributed universally, but opportunity is not. And we know from long experience that promoting social and economic development in countries where people lack access to knowledge, markets, capital, and opportunity can be frustrating and sometimes futile work. In this context, the internet can serve as a great equalizer. By providing people with access to knowledge and potential markets, networks can create opportunities where none exist.

Over the last year, I've seen this firsthand in Kenya, where farmers have seen their income grow by as much as 30 percent since they started using mobile banking technology; in Bangladesh, where more than 300,000 people have signed up to learn English on their mobile phones; and in Sub-Saharan Africa, where women entrepreneurs use the internet to get access to microcredit loans and connect themselves to global markets.

Now, these examples of progress can be replicated in the lives of the billion people at the bottom of the world's economic ladder. In many cases, the internet, mobile phones, and other connection technologies can do for economic growth what the Green Revolution did for agriculture. You can now generate significant yields from very modest inputs. And one World Bank study found that in a typical developing country, a 10 percent increase in the penetration rate for mobile phones led to an almost 1 percent increase in per capita GDP. To just put this into context, for India, that would translate into almost $10 billion a year.

A connection to global information networks is like an on-ramp to modernity. In the early years of these technologies, many believed that they would divide the world between haves and have-nots. But that hasn't happened. There are 4 billion cell phones in use today. Many of them are in the hands of market vendors, rickshaw drivers, and others who've historically lacked access to education and opportunity. Information networks have become a great leveler, and we should use them together to help lift people out of poverty and give them a freedom from want.

Now, we have every reason to be hopeful about what people can accomplish when they leverage communication networks and connection technologies to achieve progress. But make no mistake – some are and will continue to use global information networks for darker purposes. Violent extremists, criminal cartels, sexual predators, and authoritarian governments all seek to exploit these global networks. Just as terrorists have taken advantage of the openness of our societies to carry out their plots, violent extremists use the internet to radicalize and intimidate. As we work to advance freedoms, we must also work against those who use communication networks as tools of disruption and fear.

Governments and citizens must have confidence that the networks at the core of their national security and economic prosperity are safe and resilient. Now this is about more than petty hackers who deface websites. Our ability to bank online, use electronic commerce, and safeguard billions of dollars in intellectual property are all at stake if we cannot rely on the security of our information networks.

Disruptions in these systems demand a coordinated response by all governments, the private sector, and the international community. We need more tools to help law enforcement agencies cooperate across jurisdictions when criminal hackers and organized crime syndicates attack networks for financial gain. The same is true when social ills such as child pornography and the exploitation of trafficked women and girls online is there for the world to see and for those who exploit these people to make a profit. We applaud efforts such as the Council on Europe's Convention on Cybercrime that facilitate international cooperation in prosecuting such offenses. And we wish to redouble our efforts.

We have taken steps as a government, and as a Department, to find diplomatic solutions to strengthen global cyber security. We

have a lot of people in the State Department working on this. They've joined together, and we created two years ago an office to coordinate foreign policy in cyberspace. We've worked to address this challenge at the UN and in other multilateral forums and to put cyber security on the world's agenda. And President Obama has just appointed a new national cyberspace policy coordinator who will help us work even more closely to ensure that everyone's networks stay free, secure, and reliable.

States, terrorists, and those who would act as their proxies must know that the United States will protect our networks. Those who disrupt the free flow of information in our society or any other pose a threat to our economy, our government, and our civil society. Countries or individuals that engage in cyber attacks should face consequences and international condemnation. In an internet-connected world, an attack on one nation's networks can be an attack on all. And by reinforcing that message, we can create norms of behavior among states and encourage respect for the global networked commons.

The final freedom, one that was probably inherent in what both President and Mrs. Roosevelt thought about and wrote about all those years ago, is one that flows from the four I've already mentioned: the freedom to connect – the idea that governments should not prevent people from connecting to the internet, to websites, or to each other. The freedom to connect is like the freedom of assembly, only in cyberspace. It allows individuals to get online, come together, and hopefully cooperate. Once you're on the internet, you don't need to be a tycoon or a rock star to have a huge impact on society.

The largest public response to the terrorist attacks in Mumbai was launched by a 13-year-old boy. He used social networks to organize blood drives and a massive interfaith book of condolence. In Colombia, an unemployed engineer brought together more than 12 million people in 190 cities around the world to demonstrate against the FARC terrorist movement. The protests were the largest antiterrorist demonstrations in history. And in the weeks that followed, the FARC saw more demobilizations and desertions than it had during a decade of military action. And in Mexico, a single email from a private citizen who was fed up with drug-related violence snowballed into huge demonstrations in all of the country's 32 states. In Mexico City alone, 150,000 people took to the streets in protest. So the internet can help humanity push back against those who promote violence and crime and extremism.
In Iran and Moldova and other countries, online organizing has been a critical tool for advancing democracy and enabling citizens to protest suspicious election results. And even in established democracies like the United States, we've seen the power of these tools to change history. Some of you may still remember the 2008 presidential election here. (Laughter.)

The freedom to connect to these technologies can help transform societies, but it is also critically important to individuals. I was recently moved by the story of a doctor – and I won't tell you what country he was from – who was desperately trying to diagnose his daughter's rare medical condition. He consulted with two dozen specialists, but he still didn't have an answer. But he finally identified the condition, and found a cure, by using an internet search engine. That's one of the reasons why unfettered access to search engine technology is so important in individuals' lives.

Now, the principles I've outlined today will guide our approach in addressing the issue of internet freedom and the use of these technologies. And I want to speak about how we apply them in practice. The United States is committed to devoting the diplomatic, economic, and technological resources necessary to advance these freedoms. We are a nation made up of immigrants from every country and every interest that spans the globe. Our foreign policy is premised on the idea that no country more than America stands to benefit when there is cooperation among peoples and states. And no country shoulders a heavier burden when conflict and misunderstanding drive nations apart. So we are well placed to seize the opportunities that come with interconnectivity. And as the birthplace for so many of these technologies, including the internet itself, we have a responsibility to see them used for good. To do that, we need to develop our capacity for what we call, at the State Department, 21st century statecraft.

Realigning our policies and our priorities will not be easy. But adjusting to new technology rarely is. When the telegraph was introduced, it was a source of great anxiety for many in the diplomatic community, where the prospect of receiving daily instructions from capitals was not entirely welcome. But just as our diplomats eventually mastered the telegraph, they are doing the same to harness the potential of these new tools as well.

And I'm proud that the State Department is already working in more than 40 countries to help individuals silenced by oppressive governments. We are making this issue a priority at the United Nations as well, and we're including internet freedom as a component in the first resolution we introduced after returning to the United Nations Human Rights Council.

We are also supporting the development of new tools that enable citizens to exercise their rights of free expression by circumventing politically motivated censorship. We are providing funds to groups around the world to make sure that those tools get to the people who need them in local languages, and with the training they need to access the internet safely. The United States has been assisting in these efforts for some time, with a focus on implementing these programs as efficiently and effectively as possible. Both the American people and nations that censor the internet should understand that our government is committed to helping promote internet freedom.

We want to put these tools in the hands of people who will use them to advance democracy and human rights, to fight climate change and epidemics, to build global support for President Obama's goal of a world without nuclear weapons, to encourage sustainable economic development that lifts the people at the bottom up.

That's why today I'm announcing that over the next year, we will work with partners in industry, academia, and nongovernmental organizations to establish a standing effort that will harness the power of connection technologies and apply them to our diplomatic goals. By relying on mobile phones, mapping applications, and other new tools, we can empower citizens and leverage our traditional diplomacy. We can address deficiencies in the current market for innovation.

Let me give you one example. Let's say I want to create a mobile phone application that would allow people to rate government ministries, including ours, on their responsiveness and efficiency and also to ferret out and report corruption. The hardware required to make this idea work is already in the hands of billions of potential users. And the software involved would be relatively inexpensive to develop and deploy.

If people took advantage of this tool, it would help us target our foreign assistance spending, improve lives, and encourage foreign investment in countries with responsible governments. However, right now, mobile application developers have no financial assistance to pursue that project on their own, and the State Department currently lacks a mechanism to make it happen. But this initiative should help resolve that problem and provide long-term dividends from modest investments in innovation. We're going to work with experts to find the best structure for this venture, and we'll need the talent and resources of technology companies and nonprofits in order to get the best results most quickly. So for those of you in the room who have this kind of talent, expertise, please consider yourselves invited to help us.

In the meantime, there are companies, individuals, and institutions working on ideas and applications that could already advance our diplomatic and development objectives. And the State Department will be launching an innovation competition to give this work an immediate boost. We'll be asking Americans to send us their best ideas for applications and technologies that help break down language barriers, overcome illiteracy, connect people to the services and information they need. Microsoft, for example, has already developed a prototype for a digital doctor that could help provide medical care in isolated rural communities. We want to see more ideas like that. And we'll work with the winners of the competition and provide grants to help build their ideas to scale.

Now, these new initiatives will supplement a great deal of important work we've already done over this past year. In the service of our diplomatic and diplomacy objectives, I assembled a talented and experienced team to lead our 21st century statecraft efforts. This team has traveled the world helping governments and groups leverage the benefits of connection technologies. They have stood up a Civil Society 2.0 Initiative to help grassroots organizations enter the digital age. They are putting in place a program in Mexico to help combat drug-related violence by allowing people to make untracked reports to reliable sources to avoid having retribution visited against them. They brought mobile banking to Afghanistan and are now pursuing the same effort in the Democratic Republic of the Congo. In Pakistan, they created the first-ever social mobile network, called Our Voice, that has

already produced tens of millions of messages and connected young Pakistanis who want to stand up to violent extremism.

In a short span, we have taken significant strides to translate the promise of these technologies into results that make a difference. But there is still so much more to be done. And as we work together with the private sector and foreign governments to deploy the tools of 21st century statecraft, we have to remember our shared responsibility to safeguard the freedoms that I've talked about today. We feel strongly that principles like information freedom aren't just good policy, not just somehow connected to our national values, but they are universal and they're also good for business.

To use market terminology, a publicly listed company in Tunisia or Vietnam that operates in an environment of censorship will always trade at a discount relative to an identical firm in a free society. If corporate decision makers don't have access to global sources of news and information, investors will have less confidence in their decisions over the long term. Countries that censor news and information must recognize that from an economic standpoint, there is no distinction between censoring political speech and commercial speech. If businesses in your nations are denied access to either type of information, it will inevitably impact on growth.

Increasingly, U.S. companies are making the issue of internet and information freedom a greater consideration in their business decisions. I hope that their competitors and foreign governments will pay close attention to this trend. The most recent situation involving Google has attracted a great deal of interest. And we look to the Chinese authorities to conduct a thorough review of the cyber intrusions that led Google to make its announcement. And we also look for that investigation and its results to be transparent.

The internet has already been a source of tremendous progress in China, and it is fabulous. There are so many people in China now online. But countries that restrict free access to information or violate the basic rights of internet users risk walling themselves off from the progress of the next century. Now, the United States and China have different views on this issue, and we intend to address those differences candidly and consistently in the context of our positive, cooperative, and comprehensive relationship.

Now, ultimately, this issue isn't just about information freedom; it is about what kind of world we want and what kind of world we will inhabit. It's about whether we live on a planet with one internet, one global community, and a common body of knowledge that benefits and unites us all, or a fragmented planet in which access to information and opportunity is dependent on where you live and the whims of censors.

Information freedom supports the peace and security that provides a foundation for global progress. Historically, asymmetrical access to information is one of the leading causes of interstate conflict. When we face serious disputes or dangerous incidents, it's critical that people on both sides of the problem have access to the same set of facts and opinions.

As it stands, Americans can consider information presented by foreign governments. We do not block your attempts to communicate with the people in the United States. But citizens in societies that practice censorship lack exposure to outside views. In North Korea, for example, the government has tried to completely isolate its citizens from outside opinions. This lopsided access to information increases both the likelihood of conflict and the probability that small disagreements could escalate. So I hope that responsible governments with an interest in global stability will work with us to address such imbalances.

For companies, this issue is about more than claiming the moral high ground. It really comes down to the trust between firms and their customers. Consumers everywhere want to have confidence that the internet companies they rely on will provide comprehensive search results and act as responsible stewards of their own personal information. Firms that earn that confidence of those countries and basically provide that kind of service will prosper in the global marketplace. I really believe that those who lose that confidence of their customers will eventually lose customers. No matter where you live, people want to believe that what they put into the internet is not going to be used against them.

And censorship should not be in any way accepted by any company from anywhere. And in America, American companies need to make a principled stand. This needs to be part of our national brand. I'm confident that consumers worldwide will reward companies that follow those principles.

Now, we are reinvigorating the Global Internet Freedom Task Force as a forum for addressing threats to internet freedom around the world, and we are urging U.S. media companies to take a proactive role in challenging foreign governments' demands for censorship and surveillance. The private sector has a shared responsibility to help safeguard free expression. And when their business dealings threaten to undermine this freedom, they need to consider what's right, not simply what's a quick profit.

We're also encouraged by the work that's being done through the Global Network Initiative, a voluntary effort by technology companies who are working with nongovernmental organizations, academic experts, and social investment funds to respond to government requests for censorship. The initiative goes beyond mere statements of principles and establishes mechanisms to promote real accountability and transparency. As part of our commitment to support responsible private sector engagement on information freedom, the State Department will be convening a high-level meeting next month co-chaired by Under Secretaries Robert Hormats and Maria Otero to bring together firms that provide network services for talks about internet freedom, because we want to have a partnership in addressing this 21st century challenge.

Now, pursuing the freedoms I've talked about today is, I believe, the right thing to do. But I also believe it's the smart thing to do. By advancing this agenda, we align our principles, our economic goals, and our strategic priorities. We need to work toward a world in which access to networks and information brings people closer together and expands the definition of the global community. Given the magnitude of the challenges we're facing, we need people around the world to pool their knowledge and creativity to help rebuild the global economy, to protect our environment, to defeat violent extremism, and build a future in which every human being can live up to and realize his or her God-given potential.

So let me close by asking you to remember the little girl who was pulled from the rubble on Monday in Port-au-Prince. She's alive, she was reunited with her family, she will have the chance to grow up because these networks took a voice that was buried and spread it to the world. No nation, no group, no individual should stay buried in the rubble of oppression. We cannot stand by while people are separated from the human family by walls of censorship. And we cannot be silent about these issues simply because we cannot hear the cries.

So let us recommit ourselves to this cause. Let us make these technologies a force for real progress the world over. And let us go forward together to champion these freedoms for our time, for our young people who deserve every opportunity we can give them.

Thank you all very much. (Applause.)

**MODERATOR:** Thank you. Thank you, Madame Secretary. The Secretary has agreed to answer some questions. So if you would, there are going to be three microphones in the audience. If you would make your questions short, we'd appreciate it. And identify yourselves, please.

Yes. Could you wait for the microphone?

**QUESTION:** Madame Secretary, you talked about anonymity on line and how that's something – oh, I'm sorry. I'm Robert (inaudible). I'm with Northern Virginia Community College. I'm sorry.

**STAFF:** Could you hold the microphone up, please?

**QUESTION:** Sorry.

**STAFF:** Thank you.

**QUESTION:** You talked about anonymity on line and how we have to prevent that. But you also talk about censorship by governments. And I'm struck by – having a veil of anonymity in certain situations is actually quite beneficial. So are you looking to strike a balance between that and this emphasis on censorship?

**SECRETARY CLINTON:** Absolutely. I mean, this is one of the challenges we face. On the one hand, anonymity protects the exploitation of children. And on the other hand, anonymity protects the free expression of opposition to repressive governments. Anonymity allows the theft of intellectual property, but anonymity also permits people to come together in settings that gives them some basis for free expression without identifying themselves.

None of this will be easy. I think that's a fair statement. I think, as I said, we all have varying needs and rights and responsibilities. But I think these overriding principles should be our guiding light. We should err on the side of openness and do everything possible to create that, recognizing, as with any rule or any statement of principle, there are going to be exceptions.

So how we go after this, I think, is now what we're requesting many of you who are experts in this area to lend your help to us in doing. We need the guidance of technology experts. In my experience, most of them are younger than 40, but not all are younger than 40. And we need the companies that do this, and we need the dissident voices who have actually lived on the front lines so that we can try to work through the best way to make that balance you referred to.

**MODERATOR:** Forty may be (inaudible).

**SECRETARY CLINTON:** (Laughter.)

**MODERATOR:** Right over here. Yes.

**QUESTION:** Hi, my name is Courtney Radsch. I'm the Global Freedom of Expression officer at Freedom House. And I wanted to ask you – you spoke about business and relying on them to do the moral, right thing and not put profits first. But the goal of business is to make a profit. So what kind of teeth are going to be put into this? What role does the World Trade Organization play? And how are you going to encourage them to do the right thing?

**SECRETARY CLINTON:** Well, again, I think this is one of the issues that we want to have a very vigorous discussion about. I know that asking business, which is in business to make a profit, to do the right thing is not always easily translated into practical practice. On the other hand, I think there is a broader context here. It's – companies that don't follow the sanitary and hygiene procedures of a prior generation pay a price for it. And government and business have to constantly be working together to make sure that the food and other products that end up on the shelves of consumers around the world are safe, because individual consumers in a global interconnected economy can't possibly exercise that vigilance on their own.

Similarly, when it comes to censorship, we believe that having an international effort to establish some rules over internet connectivity and trying to protect the basic freedoms I discussed is in the long-term interest of business, and frankly, I would argue, governments. I used the example from the fall of the Berlin Wall. It is very hard to keep information out. It was hard to keep it out at a prior age; it is even harder now. And trying to adjust to that, work with that, and learn from that about what could be done better is going to challenge every single government in the world.

So I think business, as such a driver of economic growth globally, has to have that in mind, both when they go into countries and when they confront the kind of censorship that we're hearing about around the world. It's particularly acute for the technology companies, the media companies obviously, but it's not in any way limited to them. Other companies are facing censorship as well. So this is an issue that we have to surface and we have to talk about and we have to try to find as much common ground and then keep claiming more common ground as we go forward.

**MODERATOR:** We have a question way over here on the left.

**QUESTION:** Thank you. My name is Aly Abuzaakouk. I'm the director of Libya Forum website, promoting democracy and human rights and civil society in Libya.

We have been attacked and hacked many times. I would like Madame Secretary to tell me how can you help those voices which do not have, you know, the technology or the money to protect themselves, protect them against the hackers which are the silencers of voices from outside the countries which lacks freedom and freedom of expression.

**SECRETARY CLINTON:** Well, this is one of the issues that we are debating and we're looking for ideas as to how we can answer it in a positive way. We would invite your participation. After I take the last question, Anne-Marie Slaughter, the Director of my Policy Planning unit inside the State Department and someone – the former dean of the Woodrow Wilson School who has written a lot about interconnectivity and how we have to begin to look at the world as the networked reality that it is, will be leading a discussion. And I hope some of you with ideas, suggestions, cautions, worries will stay and really get into an in-depth discussion about that.

**MODERATOR:** Thank you. And right here in the mezzanine, right next to the microphone.

**QUESTION:** Dr. Nguyen Dinh Thang with BPSOS. We serve Vietnamese Americans and work with Vietnamese in Vietnam. While your initiative will take some time to take effect, just recently, in recent months, the Vietnamese Government sentenced several bloggers to five years all the way to 16 years in prison. So what does your office plan to do, and how the U.S. Government can confront such an emergency situation in Vietnam?

**SECRETARY CLINTON:** Well, we have publicly spoken out against the detention, conviction, and imprisonment of not only the bloggers in Vietnam, but some of the Buddhist monks and nuns and others who have been subjected to harassment.

Vietnam has made so much progress, and it's just moving with great alacrity into the future, raising the standard of living of their people. And we don't believe they should be afraid of commentary that is internal. In fact, I would like to see more governments, if you disagree with what a blogger or a website is saying, get in and argue with them. Explain what it is you're doing. Put out contrary information. Point out what the pitfalls are of the position that a blogger might be taking.

So I hope that Vietnam will move more in that direction, because I think it goes hand in hand with the progress that we've seen in the last few years there.

**MODERATOR:** Thank you. Up in the back.

**QUESTION:** Nora von Ingersleben with the Association for Competitive Technology. Madame Secretary, you mentioned that U.S. companies have to do the right thing, not just what is good for their profits. But what if I am a U.S. company and I have a subsidiary in China and the Chinese Government is coming after my guys for information and, you know, we

have resisted but now my guys have been taken to jail, my equipment is being hauled away. In that situation, what can the State Department do? Or what will the State Department do?

**SECRETARY CLINTON:** Well, we obviously speak out on those individual cases. And we are, as I said, hoping to engage in a very candid and constructive conversation with the Chinese Government. We have had a positive year of very open discussions with our Chinese counterparts. I think we have established a foundation of understanding. We disagree on important issues with them. They disagree on important issues with us. They have our perspective; we have our perspective. But obviously, we want to encourage and support increasing openness in China because we believe it will further add to the dynamic growth and the democratization on the local level that we see occurring in China.

So on individual cases, we continue to speak out. But on the broader set of issues, we hope to really have the kind of discussion that might lead to a better understanding and changes in the approach that is currently being taken.

**MODERATOR:** Thank you.

Up in the very back in the center, if you could come to the aisle so we can get a microphone to you, and then we'll come back down here. Thank you.

**QUESTION:** Imam Mohamed Magid from ADAMS Center in Virginia. My question for you, Madame Secretary: When you talk about social networking, we're trying to address the issue of youth in the West, Muslim youth. Would you be open to the youth forum to speak about foreign policy? Because one of the reason that youth is radicalized, they don't have a way to express themselves when they disagree with the United States Government or their own government overseas. Would you be open to those ideas?

**SECRETARY CLINTON:** Yes, we would. In fact, we – in the wake of the President's speech in Cairo, we have been expanding dramatically our outreach, particularly to Muslim youth. I agree with you completely, sir, that not only young people in the Muslim world, but young people across the world are increasingly disconnected from authority, from government, from all kinds of institutions that have been historically the foundations of society, because they are so interconnected through the internet, something that my generation can't really understand.

In America, the average young person spends eight hours a day with media. The internet, cell phones, television – I mean, you think about that. Eight hours a day. That's more time than they spend in school, that's more time than they spend with their families. It's often more time than they spend asleep.

So when you think about the power of this information connection to young people, I don't think it should cause panic in people my age. I don't think we should begin trying to stop it and prevent it. We ought to figure out how better to utilize it. You go back to the millennia; how were values passed around? Sitting around a fire, how were values communicated? In the homes by parents and grandparents. Now, values are being communicated by the internet, and we cannot stop it.

So let's figure out how better to use it, participate in it, and particularly to focus on the needs of young people. They're often looking for information. They're looking for answers. At least until now, in most cultures that I'm aware of, despite all of the time that young people spend with technology, when they're asked who do you look to for guidance about values, they still say their families. But if families increasingly feel disconnected from their highly connected young people and don't know what their young people are doing online, then we see the problems that can result.

And there are so many manipulators online right now, not just stoking the anxieties and the fears of Muslim youth, but youth everywhere, defined by all kinds of characteristics.

So we have our own work to do, not just through our government but through our families, through our education systems, and every other institution to make sure we understand the power of this technology and to engage with young people through it and about it.

**MODERATOR:** I see a lot of hands going up as you speak. Let's try over here on the far right.
Yes, the young lady there.

**QUESTION:** Thank you very much, Madame Secretary. Bahgi Gilamichael with the Sullivan Foundation. And also, thank you for inviting us to apply for grants. Now I'm interested in knowing what are the procedures, what is the agency we need to deal with, and if you have someone in the room we can follow up with on that? Thank you so much.

**SECRETARY CLINTON:** Thank you. Well, in addition to our panel, we have a lot of the members of our team who are working on these initiatives, and we can certainly connect up. If we invited you, we know how to find you. So we will make sure you get information about all of these programs, the ones that already exist and the ones that we're rolling out.

**MODERATOR:** There's no anonymity in this room. (Laughter.)

We have actually time for one more question, but I really would encourage you to stay for the panel that Anne-Marie Slaughter will chair on connection technologies and diplomacy immediately following. And I'm sure some of the questions will get answered.

So let's do one last question over here on the far left, down below here. Can we get a mike? Thank you.

**QUESTION:** Hello. Thank you so much. I appreciated your wonderful program speech. I'm Mary Perkins from Howard University, and at Howard University, we – very much interested in particular aspects of the internet with respect to the digital divide. Or – in your story about the young girl being pulled out of the rubble because of the text message she was able to send brings to mind – the question in my mind, how many others could have been saved had they had that technology?

**SECRETARY CLINTON:** Absolutely.

**QUESTION:** And so we're very interested in knowing, in terms of access, the – not only internet freedom but free internet for all, the universal service aspect, and what can be done, particularly right now for Haiti, with this.

**SECRETARY CLINTON:** Well, as – thank you for that. As you know, that is a continuing issue for us and for many countries around the world. We're at 4 billion cell phones. And certainly, the cell phone is becoming the principal tool of communication, both through the applications that are on it, through the texting that it enables. And there are a lot of groups, NGOs, and even businesses that are passing out and providing cell phones at very low cost.

We just have to keep incentivizing and encouraging the technology to be as low cost as possible so it can be as ubiquitous as possible.

But I think we've made enormous progress. Ten years ago, we talked a lot about the digital divide even in our own country. We are overcoming it, but there are still questions of access, still questions of cost. Now, obviously, we have to recognize that a lot of the search engines are run by for-profit companies. They're not – it's not going to be free. But there are lots of ways of trying to encourage more universal access. And that's part of the Obama Administration's overall policy on technology, not just the diplomatic and development aspects of it.

Thank you, Professor.

**MODERATOR:** Thank you, Madame Secretary. Thank you very much.

**SECRETARY CLINTON:** Thank you, Alberto. Thank you very much. Thank you. (Applause)


PRN: 2010/083

---

---

The Office of Website Management, Bureau of Public Affairs, manages this site as a portal for information from the U.S. State Department.

External links to other Internet sites should not be construed as an endorsement of the views or privacy policies contained therein.

Note: documents in Portable Document Format (PDF) require Adobe Acrobat Reader 5.0 or higher to view, download Adobe Acrobat Reader (http://get.adobe.com/reader/).