**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
P. John Veysey (SBN: 296923)
john.veysey@nelsonmullins.com
One Financial Center, Suite 3500
Boston, MA 02111
Tel: (617) 217.4645 Fax: (617) 217.4710

**NELSON MULLINS RILEY & SCARBOROUGH, LLP**
Michael J. Hurvitz (SBN: 249050)
mike.hurvitz@nelsonmullins.com
750 B Street, Suite 2200
San Diego, CA 92101
Tel: (619) 489.6110 Fax: (619) 821.2834

Attorneys for Applicant Banco Azteca S.A.
Institución de Banca Múltiple

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| *In re* Application of BANCO AZTECA S.A. INSTITUCIÓN DE BANCA MÚLTIPLE, for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding | Case No. 5:24-MC-80091-NC<br><br>**BANCO AZTECA S.A. INSTITUCIÓN DE BANCA MÚLTIPLE SECOND AMENDED NOTICE OF APPLICATION AND SECOND AMENDED EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING**<br><br>U.S. Magistrate Judge:<br>Hon. Nathanael M. Cousins<br>Courtroom: 5 |

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT as soon as the matter may be heard, before Magistrate Judge Nathanael M. Cousins, otherwise assigned, in Courtroom 5, San Jose Federal Courthouse, 280 South 1st Street, San Jose, CA 95113, Applicant Banco Azteca, S.A. Institución de Banca Múltiple (the "**Applicant**" or "**Banco Azteca**") hereby moves this Court for an Order in support of its Second

Amended Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in a Foreign Proceeding (the "**Application**") from X Corp. (formerly known as Twitter, Inc.) ("**X**"), Meta Platforms, Inc. (formerly known as Facebook, Inc.) ("**Meta**"), and Google LLC ("**Google**") (collectively the "**California Entities**") for use by the Applicant in foreign civil proceedings in Mexico. Given the relief sought, Banco Azteca may be available for a hearing as soon as the Court is available, unless the Court prefers to rule on the Application without a hearing.

This Application follows the Court's initial June 25, 2024, Order Approving the Issuance of the Requested Subpoenas (ECF 18), and the Court's September 12, 2025 Order for Banco Azteca to File a Second Amended Application For Discovery; Order to Show Cause (ECF 95), and is based on this Notice of Application and Amended Versions of the Memorandum of Points and Authorities, the Declarations of Emilio Salazar Ilarregui Galetto as outside counsel of Banco Azteca,  Jose Manuel Azpiroz Bravo as Chief Communications Officer of Grupo Elektra S.A.B. de C.V., Gabriel Alejandro Rodríguez Chavez as Applicant's Legal Counsel, and José Antonio S. García Luque as Applicant's Legal Counsel, and any other matters as may be presented to the Court at or prior to the hearing.

Dated: September 26, 2025          Respectfully submitted,

**NELSON MULLINS RILEY & SCARBOROUGH LLP**

By:     */s/ P. John Veysey*
        Michael J. Hurvitz
        P. John Veysey
        Attorneys for Applicant
        BANCO AZTECA S.A. INSTITUCIÓN DE
        BANCA MÚLTIPLE

## SECOND AMENDED MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Banco Azteca is a bank that operates in Mexico. **Exhibit A,** Declaration of Emilio Salazar Ilarregui Galetto as outside counsel of Banco Azteca[1], at ¶ 1; **Exhibit B**, Declaration of Jose Manuel Azpiroz Bravo as Chief Communications Officer of Grupo Elektra S.A.B. de C.V.[2], at ¶ 1. Beginning in late 2023, Banco Azteca became the target of a coordinated multi-national financial terrorism campaign effectuated by mostly anonymous posters (the "**Anonymous Individuals**") on X, Facebook, and YouTube[3], each owned by the California Entities, respectively. Ex. B, ¶¶ 5–6; **Exhibit C**, Declaration of Gabriel Alejandro Rodríguez Chávez as Applicant's Legal Counsel, at ¶¶ 4–5, **Exhibit D**, Declaration of José Antonio S. García Luque as Applicant's Legal Counsel, at ¶¶ 4–5. In what appears to be a coordinated effort performed with the express purpose of financially harming Applicant and its leadership, the Anonymous Individuals falsely and repeatedly claimed the Applicant faced imminent bankruptcy urging customers to pull out deposits or risk losing their money. Ex. B, ¶¶ 6–19 Ex. C, ¶¶ 4–5. Banco Azteca is not bankrupt and was not experiencing any bankruptcy crisis at the time of these posts. Ex. A, ¶¶ 7, 10–14. Additionally, the president of the National Banking and Securities Commission and the Governor of the Central Bank of Mexico since confirmed and affirmed Applicant's solvency and financial health. Ex. A, ¶¶ 10–14. Mexican authorities subsequently ordered Meta and X, among other platforms, to delete the posts at issue as false. Ex. C, ¶ 12.

Despite the Applicant's robust financial condition, this false and premeditated smear campaign negatively impacted the Applicant's business and market standing. Ex. A, ¶¶ 4–9. As was likely the intent of the campaign, the defamatory posts resulted in Banco Azteca losing approximately 7% of its deposits over several months, which amounted to a loss of about 800,000 accounts totaling about one billion U.S. dollars. *Id.* at ¶¶ 5–6. Because Applicant is a major bank in Mexico, the Anonymous Individuals' actions caused panic in the financial system. *Id.* at ¶ 9. Indeed, certain of the Anonymous

---

[1] Exhibit A remains unedited as the facts and circumstances described therein remain unchanged since Applicant filed its original Application, and as such Applicant attaches Exhibit A in its original format.
[2] Grupo Elektra S.A.B. de C.V. ("Grupo Elektra") is the Applicant's parent company. Ex. B, ¶ 9.
[3] YouTube is owned and operated by Google.

BANCO AZTECA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS SECOND AMENDED EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING

Individuals proudly boasted about that very effect of their defamatory statements. Ex. B, ¶ 15. To date, Applicant has been unable to locate the identities of the Anonymous Individuals to serve them in its pending civil lawsuit in Mexico. Ex. C, ¶¶ 33–39; **Exhibit G, Translated Civil Complaint Copy.**

## II.    RELEVANT FACTS

### A.    Banco Azteca Company Profile and Background.

The Applicant is a bank that operates in Mexico Ex. A, ¶ 1. By November 2023, the Applicant was the ninth largest banking institution in Mexico in terms of assets, and as of January 2024, the second largest bank measured by number of clients. Ex. A, ¶ 4.

### B.    Online Posters Launch Coordinated Internet Campaign to Damage Banco Azteca by Falsely Claiming it Was Bankrupt to Create Panic Among its Accountholders.

On or about late November 2023, mostly anonymous individuals using various accounts on different social media platforms began a smear campaign against the Applicant, stating that the Applicant was bankrupt and urged the public to withdraw their money from the Applicant. Ex. C, ¶¶ 4–5. For example, one of the earliest and most extensive posters used the X handle @catrina_nortena ("La Catrina Norteña"). Ex. B, ¶ 7. On November 26, 2023, in the first of multiple posts that Mexican officials later verified as false, La Catrina Norteña stated the following:

> …Let's see how clients (now ex) of @Azteca Bank as @ELange47 just took out all his money, more than 88 thousand pesos, from that bank after the Suspicious Video of @ChapoyPati where it says that everything is "fine" with the bank. And after the Old Man #DonkeyTeeth @RicardoBSalinas could not pay the 488 million dollars he owes in New York plus the 25 thousand million pesos he owes in taxes, everything indicates that he lacks liquidity and that all his companies are about to fail...

*Id.* at ¶ 8, Ex. 1 thereto at 1.[4] For reference Ricardo Salinas, or Ricardo Salinas Pliego, is a businessman in Mexico who is the Chairperson of Grupo Elektra, Applicant's parent company. *Id.*, ¶ 9.

Each post included the hashtag "#bancoaztecaenquiebra" ("Banco Azteca bankrupt") which went viral, evident from the thousands of reposts of each post by this account. Ex. B, at ¶¶ 10–13. The account posted at least ten other similar messages, each garnering more reposts and shares, and it began advising account holders to withdraw their money, falsely implying the Applicant's inability to

---

[4]    For the Court's reference, any social media posts that applicant quotes here are condensed, roughly translated from Spanish to English, and edited to remove graphics, including embedded videos, pictures, or text illustrations like "emojis." In addition to the exhibits, attached and cited herein, the posts at issue remain available on platforms like X. See, e.g., https://twitter.com/catrina_nortena/status/1729183738624463153 (last visited September 22, 2025).

BANCO AZTECA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS SECOND AMENDED EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING

guarantee funds. *Id.* at ¶ 11, Ex. 1 thereto at 2–18. For example, on December 7, 2023, in a post that received nearly 90,000 views, the account stated the following above a video of a woman claiming she needed to withdraw her accounts:

> @Azteca Bank is keeping the REMITTANCES of its clients who come from the US[.] Housewife tells how they illegally blocked her account and won't let her withdraw the money her husband sends from the US. She shows all the things they are asking from her to unblock it and advise others to withdraw their money before the same thing happens to them…

*Id.* at ¶ 13, Ex. 1 thereto at 16–17. Banco Azteca investigated the allegations made in the subject video, which were found to be baseless. *Id.* at ¶ 14.

Using numerous other accounts on the California Entities' platforms, the Anonymous Individuals quickly worked in coordination to elevate the campaign to damage Applicant's business, including the false and harmful narrative that a bank run had begun on Banco Azteca. Ex. B at ¶ 17.

For example, other X users with large followings promoted similar falsehoods. Individuals behind the X handle @alberto_rudo, who posted at least 26 messages on this issue with the same hashtag, also implored direct action by account holders. For example (" . . . Withdraw your money from that thieving bank immediately!"); *Id.* at 4 ("Smart people! They are already coming to withdraw their money from @bancoazteca. Don't waste your time! Tomorrow could be too late, it's time to protect your assets, don't think about it anymore . . #bancoaztecaesquiebra."). *See* Ex. D, Exhibit 1 thereto, at 1-8; *see*, *e.g.*, *id.* at 2. User @freddyoliviery stated: "If you have your money in @BancoAzteca, the recommendation is to withdraw your funds from there. It's for your safety [emoji]"); (". . . if you have money in @BancoAzteca, withdraw it."); ("they do well to withdraw their money from @BancoAzteca. The imminent bankruptcy of @Azteca is inevitable."). *See* Ex. D, Exhibit 3 thereto, at 16; *Id.* at 17.

On YouTube, owned by Respondent Google, users behind the account El Charro Político made similar statements, including in the following video title: "BANCO AZTECA BANKRUPTCY WITHDRAW IMMEDIATELY". (Ex. D ¶ 16; ECF 39-2 at 22). YouTube account Iber Alejandro posted similar messages: "WITHDRAW YOUR SAVINGS FROM BANCO AZTECA! THE CAMPAIGN THAT IS SOUNDING LOUD ON THE NETWORKS". (*Id.*, 17 ECF 39-2 at 22).

Morena New York Comité 1, an account on Meta's Facebook platform, posted: "ELEKTRA AND BANCO AZTECA on the verge of bankruptcy…! So, take out your money or it will disappear with them … Fools are those who trust Banco Azteca and don't want to withdraw…" Ex. 6, Ex. 6 thereto.[5]

In response, many other users posted and shared similar content to further the campaign Applicant believes was orchestrated by these primary users by reusing the #bancoaztecaenquiebra hashtag. Ex. B, ¶ 10. In direct response to the campaign, thousands of account holders rushed to withdraw their funds, which damaged the Applicant by causing a major loss of customers and their corresponding deposits. Ex. A, ¶¶ 5–8. The defamatory posts resulted in Banco Azteca losing approximately 7% of deposits over several months, amounting to a loss of about 800,000 accounts, totaling about one billion U.S. dollars. *Id.* at ¶ 6. Because Applicant is a major bank in Mexico, the Anonymous Individuals' actions caused panic in the financial system. *Id.* at ¶ 9.

Removing any doubt of the Anonymous Individuals' intent to harm Applicant and its affiliated companies, while acknowledging previous falsehoods, on December 5, 2023, La Catrina Norteña posted an image of Grupo Elektra's stock plunging during morning trading with the caption: "…The shares of @ElektraMx once again drop after *rumors* of BANKRUPTCY of its financial arm @Azteca Bank…" Ex. B, ¶ 15, Ex. 1 thereto at 12 (emphasis added). As of February 25, 2024, the La Catrina Norteña account had over 205,000 followers. As of the date of this filing, it has 345,000 followers.

After the initial phase of its civil lawsuit, Applicant was only able to discover certain names of individuals possibly connected to certain accounts. *Id.* at ¶ 21. This Application is limited to those Accounts where the identity of the Anonymous Individuals and nexus to the accounts remains entirely unresolved, including each of the accounts listed above.

## C. Banco Azteca Takes Immediate Action to Prevent Further Panic and Harm.

In addition to the financial and reputational harm incurred by these posts, Applicant and its affiliates had to undertake the onerous and expensive task of responding to other regulatory scrutiny

---

[5]     Meta has since argued that users behind this account may be based in both Mexico and the United States based on language on its account page. (See, e.g. ECF 45 at 3). Banco Azteca continues to challenge the relevance and import of this assertion given the deliberately harmful conduct by the individuals operating this account, regardless of their location.

and defending their reputation following months of negative exposure in the Mexican news media.[6] Ex. B, ¶ 23. Among these efforts, the posts at issue forced the Applicant to seek public confirmation of the bank's financial health, solvency, and other compliance from the Mexican government's National Banking and Securities Commission ("CNBV"). Ex. A, ¶ 10. The CNBV oversees and regulates Mexico's financial institutions. *Id.* at ¶ 11. Banco Azteca's Capitalization Index (ICAP) on October 2023 was 15.08, so it is classified in early warning category 1, indicating that the institution is sufficiently capitalized to face unexpected loss scenarios, so that no supervisory actions by the regulator are required in relation to its solvency. *Id.* at ¶ 12. Further, Jesus de la Fuente Rodriguez, the president of the CNBV affirmed Applicant's solvency and financial health. *Id.* at ¶ 13. Similarly, during the presentation of the Financial Stability Report of the second half of 2023, Victoria Rodriguez Ceja, Governor of the Central Bank of Mexico, confirmed and affirmed Applicant's solvency and financial health. *Id.* at ¶ 14. The CNBV's reports demonstrate the knowing and reckless falsity of the posts at issue, including thee posts' overt intent to harm the Applicant and its affiliates and leadership.

On January 17, 2024, the Applicant's legal representatives in Mexico demanded in writing that Meta and X, through their affiliates, remove certain offending posts and disable their related accounts. Ex. B, ¶ 24, Ex. 2 thereto; Ex. C, ¶ 6, Ex. 1 thereto. These letters explained why those accounts violated Mexican law and the X and Meta's own respective policies. Ex. C, ¶ 7, Ex. 1 thereto. These laws included Section III of Article 254 of the Federal Criminal Code, which criminalizes false statements or news that may create economic disturbances in Mexico's domestic market. *Id.* at ¶ 7, Ex. 1 thereto.

### D. Banco Azteca Reports the Defamation Campaign and Related Blackmail Attempts to Law Enforcement in Mexico.[7]

On January 19, 2024, Applicant filed and ratified a criminal complaint, which was registered under investigation folder number 5101/202254 of Agency 4 of Bulk Processing of the Public

---

[6] *See*, *e.g.*, El Universal, "Rumors about the effects on Banco Azteca's financial situation are false: Elektra" [translated] (December 4, 2023), https://www.eluniversal.com.mx/cartera/rumores-sobre-afectaciones-a-situacion-financiera-de-banco-azteca-son-falsos-elektra/.

[7] While this Application seeks information exclusively for discovery to support Applicant's civil litigation in Mexico, Applicant nonetheless retains a cleaned up, abbreviated summary of these events to reiterate the immediacy of Applicant's initial timeline and preliminary actions vis-à-vis the criminal investigation. Because certain Respondents have cited the criminal investigation to question the propriety of this matter, notwithstanding their stated prior understanding

Prosecutor's Office of the State of Jalisco. *Id.* at ¶ 8. The complaint included blackmail claims based on statements made to the Applicant by individuals purportedly representing unidentified alleged posters that they would take down the posts if the Applicant paid them. *Id.* at ¶ 10.

On February 6, 2024, following demands by law enforcement investigators in the State of Jalisco and related hearings, a Preliminary Criminal Judge ordered that Meta and X remove the offending publications from at least ten accounts, including those relating to the La Catrina Norteña and Alberto Rudo accounts. *Id.* at ¶ 12. On February 13, 2024, following Applicant's request, the Preliminary Criminal Judge permitted notices to issue to the California Entities' Mexico City addresses to comply with the February 6 order. *Id.* at ¶¶ 13-14. The official notice was physically delivered by the Applicant to Meta on February 23, 2024. *Id.* at ¶ 15. However, Facebook México, S. de R.L. de C.V., returned the notice and stated that Meta Platforms, Inc and/or Meta Technologies Ireland Limited are not domiciled in the place where the notice was delivered. *Id.* at ¶ 16. It mentioned that the entity that operates the Facebook service for users in Mexico is Meta Platforms, Inc., and thus, it is the entity that has control over the information of the users. *Id.* at ¶ 17. It further stated that it was unable to address the request because the U.S. based entity managed the data system that stored this information, and therefore, the notice had to be delivered to such entity at its California domicile. *Id.* at ¶ 18. X does not have a known domicile in Mexico so no official notice was delivered. *Id.* at ¶ 19.

### E.    Banco Azteca Prepares and Files Civil Lawsuits in Mexico Against Known Defendants and Seeks Preliminary Discovery in Its First Two Applications.

During the same time, Applicant began work to file civil lawsuits in Mexico for claims including defamation/libel based on false statements and for compensatory and reputational damages. As noted in Applicant's updates earlier this year, service was approved for an initial round of defendants in late 2024, with the first service effected in February 2025. (ECF 79 at 14–15).

Since commencing this matter in its First Application on April 16, 2024, Applicant still seeks the identity of the six users listed above. Moreover, in order to bring a civil claim against an individual in Mexico, the individual must be fully identified, which means they must be named. Ex. D, ¶ 7.

---

that the Amended Application was filed to exclude discovery for the criminal investigation, Applicant seeks to avoid any argument that it is flouting any of the case history at this point.

BANCO AZTECA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS SECOND AMENDED EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING DISCOVERY FOR USE IN A FOREIGN PROCEEDING

Because Applicant's direct requests to the California Entities were unsuccessful in obtaining the identities of certain anonymous posters, including ostensible ringleaders like those listed above, Applicant has yet to serve these individuals in its active civil lawsuit. Ex. C at ¶¶ 32–33. Consequently, the discovery sought here is necessary for Applicant continue to protect its rights in Mexico.

## III. PROCEDURAL HISTORY

On April 16, 2024, Applicant filed its original Ex Parte Application for an Order Pursuant to 28 U.S.C. § 1782 Authorizing Discovery for Use in A Foreign Proceeding and related materials (the "**First Application**"). ECF 1. On April 17, 2024, the Court entered an Order Directing Service of Ex Parte Application; And Ordering Meet and Confer. ECF 5. To comply with the Court's Order and related instructions, counsel for the Applicant and the California Entities conferenced to discuss their respective positions regarding the subpoenas attached to the First Application. On May 30, 2024, X Corp. and Applicant filed a Discovery Letter with the Court concerning X Corp.'s position that the Court should deny the First Application. ECF 15. Meta and Google did not oppose the First Application but reserved the right to object to Applicant's subpoenas at a later point. On June 25, 2024, the Court granted the First Application and allowed service of its Subpoenas. ECF 18. All the California Entities served objections in the following month.

After the Court's Order, Google's counsel contacted Applicant's counsel to discuss concerns similar to those X asserted, namely that subpoenas in aid of a foreign criminal investigation risked circumvention of other procedures available for law enforcement to gather that information. Banco Azteca, following advice from counsel, agreed to this revision. Applicant confirmed the same with each of the California Entities, with a hope towards narrowing the issues and promptly securing the information it sought. Applicant explained the proposed Amended Application in detail to each California Entity and negotiated a stipulated briefing schedule to extend the Court's other deadlines. Applicant noted the same in its Amended Application. ECF 39 at 14.

On August 20, 2024, Applicant filed the Amended Application, drafted to focus on seeking discovery for Banco Azteca's civil lawsuit in Mexico, thus removing requests that the Court allow subpoenas to issue in connection with the criminal investigation described above. ECF 39. Through a

BANCO AZTECA'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS SECOND
AMENDED EX PARTE APPLICATION FOR AN ORDER PURSUANT TO 28 U.S.C. § 1782 AUTHORIZING
DISCOVERY FOR USE IN A FOREIGN PROCEEDING

drafting mistake, the filed Amended Application mistakenly retained the word "criminal" in several places but otherwise reflected a focus on the civil litigation. ECF 39 at 2, 15, 20. The Amended Application also described counsel's negotiations with Respondents to redirect the Application's purpose and invited negotiation of measures like protective orders to narrow any concerns. *Id.*

On September 17, 2025, all Respondents filed Motions to Quash Applicants' Subpoenas, arguing concerns over the ongoing criminal investigation in Mexico and attacking the viability and purpose of Applicant's civil lawsuit. Applicant opposed each Motion, noting in each that the investigation in Mexico was irrelevant to the Amended Application because Applicant was seeking discovery to support its civil lawsuit in Mexico, and concluded each by clarifying that Applicant was seeking discovery for its civil lawsuit, mentioning nothing about the criminal investigation. Each movant filed replies addressing Banco Azteca's arguments, including positions like the following:

> Regardless of whether Banco Azteca has essentially abandoned the criminal proceeding in Mexico as the basis for this proceeding, the Court should direct that Banco Azteca produce a copy of the criminal complaint and any other documents in its possession so that it can determine whether there was a basis to commence this proceeding in the first instance.

ECF 44, at 13, n. 10.

Since the parties briefed the Motions to Quash, the parties only held two meet and confers, one of which was to talk about a briefing schedule on related Motions to Seal, and have yet to negotiate any protective order or other possible terms to narrow the issues in this matter. In a November 13, 2024 hearing, the Court discussed suggestions how the parties could negotiate matters to narrow the issues (*see* ECF 71 at 17:1-18:13) formalized by a November 14, 2024 Minute Order, (*see* ECF 67), Banco Azteca reduced the number of accounts at issue to the six covered in this Application, limited the information sought by its subpoenas, and supplied further updates on the progress of its civil lawsuit in Mexico. (ECF 75, 79).

On September 12, 2025, the Court asked Applicant to resolve any ambiguities in the Amended Application by filing a Second Amended Application. Applicant submits this Second Amended Application to clarify Applicant's goals and the underlying actions for which it seeks discovery.[8]

## IV.    LEGAL STANDARD

Section 1782 authorizes "[t]he district court of the district in which a person resides or is found [to] order [them] to give [their] testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal . . . upon the application of any interested person…." 28 U.S.C. § 1782(a). To obtain discovery under Section 1782, an applicant must meet three statutory requirements: (1) the person or entity from whom discovery is sought "resides or is found" in this district; (2) the discovery must be for the purpose of "use in a proceeding" before a "foreign or international tribunal;" and (3) the application must be made by an "interested person" in the foreign judicial proceeding." *In re Bureau Veritas*, 5:22-MC-80132-EJD, 2022 WL 3563773, at *2 (N.D. Cal. Aug. 17, 2022) (citing *Khrapunov v. Prosyankin*, 931 F.3d 922, 925 (9th Cir. 2019)).

Once the Court determines that the mandatory requirements for relief under Section 1782 are met, the Court is free to grant discovery in its discretion. The U.S. Supreme Court identified the following discretionary factors courts should consider in evaluating a Section 1782 application: (1) whether the "person from whom discovery is sought is a participant in the foreign proceeding;" (2) "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance;" (3) whether the discovery request is an "attempt to circumvent proof-gathering restrictions or other policies of a foreign country or the United States;" and (4) whether the discovery requested is "unduly intrusive or burdensome." *In re Takagi*, 23-MC-80124-JSC, 2023 WL 4551074, at *3 (N.D. Cal. July 13, 2023) (citing *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004) ("*Intel*").

---

[8]    Applicant separately notes that in the course of this matter, Meta, X, Google, and the Affected Account holders separately sent objections and filed Motions to Quash Applicant's Subpoenas and a substantive hearing has yet to take place. Applicant does not directly address those objections and Motions here but reserves the right to further address them.

Furthermore, because the standards set forth in the Federal Rules of Civil Procedure guide discovery under Section 1782, in addition to the standards the Supreme Court set forth in *Intel*, some courts may apply an additional "good cause" standard like courts may apply under Rule 26(d) for early discovery requests. *In re Hoteles City Express*, No. 18-MC-80112-JSC, 2018 WL 3417551, at *3 (N.D. Cal. July 13, 2018) (citing *OpenMind Solutions, Inc. v. Does 1–39*, No. 11–3311, 2011 WL 4715200, at *2 (N.D. Cal. Oct. 7, 2011)). To consider whether there is "good cause" to support a Section 1782 application to reveal an unknown party's identity, courts examine these factors:

> (1) the plaintiff can identify the missing party with sufficient specificity such that the Court can determine that defendant is a real person or entity who could be sued in federal court; (2) the plaintiff has identified all previous steps taken to locate the elusive defendant; (3) the plaintiff's suit against defendant could withstand a motion to dismiss; and (4) the plaintiff has demonstrated that there is a reasonable likelihood of being able to identify the defendant through discovery such that service of process would be possible.

*In re Hoteles City Express*, 2018 WL 3417551, at *3; *see also Tokyo Univ. of Soc. Welfare v. Twitter, Inc.*, 21-MC-80102-DMR, 2021 WL 4124216, at *3 (N.D. Cal. Sept. 9, 2021).

## V.    ARGUMENT

United States District Courts are empowered by 28 U.S.C. § 1782 to compel discovery for use in a proceeding in a foreign or international tribunal. In this case, the Applicant requests information from X, Meta, and Google, all of which are located within the jurisdiction of this Court, regarding the identity of the anonymous individuals, for use in a current civil proceeding in Mexico. For the reasons set forth below, this Court should grant this Application, and authorize the issuance of the Subpoenas attached as **Composite Exhibit E.**

### A.    The Discovery Sought Meets the Statutory Requirements of Section 1782.

#### 1.    The Entities from Which Discovery Is Sought Reside or are Found in this District.

The California Entities from which the Applicant seeks discovery, specifically X, Meta, and Google, are all found in this District. **Composite Exhibit F: California Statements of Information for X, Meta and Google**. *See In re Todo*, 5:22-MC-80248-EJD, 2022 WL 4775893, at *2 ("In this

district, business entities are 'found' where the business is incorporated, is headquartered, or where it has a principal place of business.") .X is a Nevada corporation with its principal office located in San Francisco, California. *Id.* at 1. Meta is a Delaware corporation with its principal office located in Menlo Park, California. *Id.* at 3. Finally, Google is a Delaware limited liability company with its principal office located in Mountain View, California. *Id.* at 5. *See In re Todo*, 5:22-MC-80248-EJD, 2022 WL 4775893, at *2 ("In this district, business entities are 'found' where the business is incorporated, is headquartered, or where it has a principal place of business.").

## 2.    The Discovery Is Intended for Use in a Foreign Proceeding.

The second statutory requirement is that the discovery sought is intended "for use" in a "foreign or international tribunal." See, e.g., *Intel Corp.*, 542 U.S. at 258. To meet the "for use" test, the materials sought need not be discoverable, *id.* at 243, nor must the applicant even show that the materials are admissible as evidence in the foreign jurisdiction. *Qualcomm Inc.*, 18-MC-80134-NC, 2018 WL 6660068, at *2 (N.D. Cal. Dec. 19, 2018); *In re Roz Trading Ltd.*, No. 1:06-CV-02305-WSD, 2007 WL 120844, at *2 (N.D. Ga. Jan. 11, 2007) ("§ 1782 aid [is] appropriate even in situations where the tribunal would not order such discovery itself, or might decide not to accept all discovery properly ordered pursuant to § 1782(a)…"); *In re Appl. Of Grupo Qumma*, No. M 8-85, 2005 WL 937486, at *3 (S.D.N.Y. Apr. 22, 2005). "Courts in the Ninth Circuit have observed that the 'for use' requirement focuses on the practical ability of an applicant to place a beneficial document … before a foreign tribunal." *Qualcomm Inc.*, 2018 WL 6660068, at *2 (internal quotations and citations omitted). "Thus, applicants must show that the material requested is tethered to a specific foreign proceeding and is relevant." *Id.* Finally, this requirement is not limited to adjudicative proceedings that are pending. Rather, Section 1782(a) may be invoked where such proceedings are "likely to occur" or are "within reasonable contemplation." *Intel Corp.*, 542 U.S. at 258–59.

This District will allow private parties to seek foreign discovery for a contemplated or pending civil action. See, e.g. *In re Keizankai*, No. 22-mc-80253-BLF, 2022 WL 5122958 (N.D. Cal. Oct. 4, 2022), *passim*; *In re Medical Incorporated Association Shokokai*, No. 22-mc-80250, 2022 WL 4591796 (N.D. Cal. Sep. 29, 2022) (granting applications for Japanese businesses seeking identity of

anonymous authors of damaging online reviews). The discovery Applicant seeks is relevant to its active civil lawsuit in Mexico. *See generally*, Exs. B, C. The identity of the Anonymous Individuals is required before serving them in the civil lawsuit, and Applicant seeks that information through discovery here, among other information to assess their involvement in the wrongdoing alleged. Ex. C, ¶¶ 33–35.

### 3.    The Applicant Is an Interested Person in the Foreign Judicial Proceeding.

The Applicant is an "interested person" under Section 1782 because Applicant filed a civil lawsuit against other individuals involved in the same defamation campaign as those for whose names Applicant seeks to discover through this Second Amended Application. *See* Ex. C, ¶¶ 25; *Intel Corp.*, 542 U.S. at 256–57 (litigants in a foreign action are interested persons); *In re Keizankai*, No. 2022 WL 5122958, at *6. Accordingly, the Applicant satisfies this requirement.

### B.    The Discovery Sought Meets the *Intel* Discretionary Factors

The Court should also grant this Application based on *Intel's* discretionary factors.

### 1.    The California Entities Are Not Participants in the Foreign Proceeding.

The first *Intel* factor is "whether the person from whom discovery is sought is a participant in the foreign proceeding." *Intel Corp.*, 542 U.S. at 264. X, Meta, and Google are not parties or participants in Applicant's civil lawsuit in Mexico and it is not expected that they will become parties. Ex. C, ¶ 26. Accordingly, this factor weighs in favor of granting the Application.

### 2.    No Challenges Exist As To Nature of the Foreign Tribunal and the Mexican Government's Probable Receptivity to the Court's Judicial Assistance.

The second *Intel* factor requires the Court to consider "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance." *Intel Corp.*, 542 U.S. at 264. "This factor focuses on whether the foreign tribunal is willing to consider the information sought." *In re Ex Parte App. Varian Med. Sys. Int'l AG*, 2016 WL 1161568, *4 (N.D. Cal. Mar. 4, 2016). Under this factor, "courts look for authoritative proof that a foreign tribunal would *reject* evidence obtained with the aid of § 1782." *In re Application of Joint Stock Co. Raiffeinsenbank*, 2016 WL 6474224, at *5 (N.D. Cal. Nov. 2, 2016) (emphasis in original). In the absence of authoritative proof that a foreign

1   tribunal would reject evidence obtained with the aid of Section 1782, courts err towards permitting

2   discovery. *In re Ex Parte Application Varian Med. Sys. Int'l AG*, 2016 WL 1161568, at *4.

3           There are no known restrictions or any policies under the laws of Mexico limiting U.S. federal

4   court judicial assistance, and courts in Mexico are receptive to assistance in discovery by U.S. federal

5   courts. Ex. C, ¶¶ 29. Courts in other jurisdictions have granted Section 1782 discovery for use in

6   proceedings in Mexico. See e.g. *In re Application of Banco Mercantil De Norte, S.A.*, 3:23MC08

7   (DJN), 2023 WL 6690708, at *7–8 (E.D. Va. Oct. 12, 2023) (granting Section 1782 application for

8   discovery in proceeding in Mexico, noting that "[i]n the absence of 'reliable evidence' that the

9   Mexican tribunal would not use any of the requested material, the second *Intel* factor counsels in favor

10  of granting a § 1782 application" and highlighting "numerous cases demonstrating Mexican courts'

11  general receptivity to U.S. courts' assistance in discovery...") (citing *In re Rivada Networks*, 230 F.

12  Supp. 3d 467, 469 (E.D. Va. 2017); *Bush v. Cardtronics, Inc.*, No. H-20-2642, 2020 WL 6261694, at

13  *4 (S.D. Tex. Oct. 23, 2020); and *Grupo Mexico Sab De CV*, No. 3:14-MC-00073-G-BH, 2014 WL

14  12691097, at *3 (N.D. Tex. Oct. 17, 2014)). This factor weighs in favor of this Application.

15                      3.      This Application Is Not an Attempt to Circumvent the Foreign Tribunal's
16                              Proof-Gathering Restrictions.

17          The third *Intel* factor is whether the request "conceals an attempt to circumvent foreign proof-

18  gathering restrictions or other policies of a foreign country or the United States." *Intel Corp.*, 542

19  U.S. at 264–65. Courts have found that this factor weighs in favor of discovery where there is

20  "nothing to suggest that [the applicant] is attempting to circumvent foreign proof gathering

21  restrictions." *In re Google Inc.*, No. 14-mc-80333-DMR, 2014 WL 7146994, at *3 (N.D. Cal. Dec.

22  15, 2014); *In re Eurasian Natural Resources Corp.*, No. 18-mc-80041-LB, 2018 WL 1557167, at *3

23  (N.D. Cal. Mar. 30, 2018) (third *Intel* factor weighs in favor of discovery where there is "no evidence"

24  of an attempt to circumvent foreign proof gathering restrictions or policies). This applies even where

25  an applicant is the victim in a pending or previous criminal investigation in the foreign jurisdiction.

26  *See, e.g. In re Keizankai*, WL 5122958, *passim*; *In re Shokokai*, 2022 WL 4591796, at *2–4.

27

28

Here, the Applicant is not attempting to circumvent any foreign proof-gathering restrictions or other policies of Mexico or the United States. Ex. C, ¶ 32. Applicant is seeking the Anonymous Individuals' identifying information, and confirmation of their posting activity for necessary discovery to support Applicant's civil case. See *id.* at ¶¶ 27–28, 33–39.

Finally, Applicant is not targeting this information to improperly assume or circumvent the investigative role of law enforcement authorities in Mexico to prosecute any criminal proceedings against same or similar individuals. Applicant has no current role or control over that investigation. Instead, Applicant's only purpose here is to seek information necessary to add the six anonymous posters listed her to Applicant's civil lawsuit. Applicant will not use and does not seek any of the information in this matter to investigate or otherwise support the criminal investigation in Mexico.

Because there is nothing to suggest that the Applicant is attempting to circumvent foreign proof gathering restrictions or policies, and because Applicant is entitled to seek this information to include the Anonymous Individuals in its civil action, this factor weighs in favor of authorizing discovery.

### 4.    The Requested Discovery Is Not Unduly Intrusive or Burdensome.

The fourth and final *Intel* factor is whether "the discovery requested is unduly intrusive or burdensome." *Intel Corp.*, 542 U.S. at 265. Requests are unduly intrusive and burdensome where they are not narrowly tailored and appear to be a broad "fishing expedition" for irrelevant information. *In re Ex Parte Application of Qualcomm Inc.*, 162 F. Supp. 3d 1029, 1043 (N.D. Cal. 2016).

The discovery Applicant seeks is not unduly intrusive or burdensome. It is narrowly tailored only to seek information sufficient to satisfy two goals. First, this information will help the Applicant identify the Anonymous Individuals, such as their names and contact information, or information to connect the Anonymous Individuals to certain public posts that damaged Applicant, and to include those parties in Applicant's civil lawsuit. *See generally*, Ex. E; *also see In re Frontier Co., Ltd.*, No. 19-mc-80184-LB, 2019 WL 3345348, at *5 (N.D. Cal. July 25, 2019) (granting a Section 1782 request to issue a subpoena for identifying information, finding that the request "is narrowly tailored and is not overly intrusive [as] Frontier is seeking to subpoena identifying information and not the content of any communication…"); *Ex Parte Darmon*, 17-MC-80089-DMR, 2017 WL 3283969, at *2 (N.D.

Cal. Aug. 2, 2017) (finding that the proposed subpoena requesting documents that establish or would help to establish the identity of an anonymous author of blog posts including the username(s), given name(s), surname(s), email address(es), and affiliated IP addresses, was not unduly burdensome). Here, the Applicant has the content of the communications at issue—public posts on public platforms—and just needs information identifying the posters. Second, this information will enable the Applicant to verify that the Anonymous Individuals are actually responsible for distributing false and economically harmful statements across the internet; as opposed to only knowing the online pseudonyms used by these individuals or entities. Confirmation of this information will also enable Applicant to properly assess any defenses that certain defendants did not circulate these posts. Ex. C, ¶ 35. This includes both the Anonymous Individuals and also the accounts where Applicant was able to ascertain limited information surrounding the identities of individuals associated with those accounts, including, how and if certain accounts may be related or acted in concert to harm applicant.

In the alternative, the Applicant continues to invite any of the Respondents to meet and confer, as it has and continues to do, if those parties would like to discuss whether it is possible to narrow the information sought, or, as Applicant (and the Court) have previously urged, to negotiate a protective order that would resolve any concerns. Indeed, Applicant, in good faith and in compliance with the Court's instructions, has meaningfully narrowed the accounts and information categories at issue, and continues to seek a cooperative solution among the California Entities to secure this information.

Finally, and as stated in further detail below, Respondents and the Affected Account Holders' putative concerns over "unmasking" and First Amendment considerations do not tip the balance towards denial on this factor. These protections "'[are] not unlimited,' and competing interests, including a person's interest in protecting his reputation against falsehoods, can outweigh an anonymous speaker's free-speech rights." *Zuru, Inc. v. Glassdoor, Inc.*, 614 F. Supp. 3d 697, 706 (N.D. Cal. 2022), *quoting In re Anonymous Online Speakers*, 661 F.3d 1168, 1173 (9th Cir. 2011). Each post is defamatory commercial speech, stated as an independent fact and free of opinion, with the intended purpose of creating a panic across Applicant's customer base and applicable financial markets to damage Applicant and its reputation. *See* Ex. D, *passim*. Applicant's harm is not imaginary,

it was significant, and the Anonymous Individuals actually credited their own "rumors" with causing that harm. *Id.*, ¶ 13. Speech of that nature is not protected in Mexico. The unduly burdensome *Intel* factor presumes a potentially easier, more narrow option exists to discover information, and discourages foreign discovery where the requests are irrelevant or cast to wide a net. Here, there is no other way to connect the Anonymous Individuals to the posts at issue. Applicant has been cooperative to narrow the scope of its search to only that information necessary to serve the purpose just described.

Therefore, because the discovery requested here is limited and will only seek identifying information of the Anonymous Individuals and other limited data like date and time signatures for the posts at issue, and not any specific communications, the request is not unduly intrusive or burdensome.

### C. The Applicant Seeks Early Discovery in Good Faith.

The Applicant's request for the Court's assistance to seek the information requested herein from the California Entities is the only way that the Applicant will be able to learn the identities of the Anonymous Posters and gather evidence that they circulated the posts that harmed the Applicant.

#### 1. The Defendants Are Real People that Could Be Sued in Federal Court.

The accounts posting statements that harmed the Applicant are run and managed by human users and related entities—all capable of being sued—which this discovery seeks to identify. As stated above, the first good faith factor is whether "'the plaintiff can identify the missing party with sufficient specificity such that the Court can determine that defendant is a real person or entity who could be sued in federal court.'" *In re Hoteles City Express*, No. 18-MC-80112-JSC, 2018 WL 3417551, at *3, (citing *OpenMind Solutions, Inc. v. Does 1–39*, No. 11–3311, 2011 WL 4715200, at *2 (N.D. Cal. Oct. 7, 2011) (*citing Columbia Ins. Co. v. seescandy.com*, 185 F.R.D. 573, 578–80 (N.D. Cal. 1999)). In *OpenMind*, the plaintiff satisfied this factor by identifying the unique IP addresses concealing the defendants' real names to seek discovery from the services to which those addresses subscribed because those services would possess the underlying subscriber information and geographic location for the addresses at issue. *OpenMind Solutions*, No. 11–3311, 2011 WL 4715200, at *1–2.

Here, the Application, its supporting declarations (Exs. A, B, C, D), and its subpoenas (Exhibit E), list the remaining specific accounts that posted the defamatory statements. Moreover, case law

demonstrates the known fact that providers like the California Entities are indeed able to identify individual subscribers to their respective services and other data like user location, IP address, and metadata relating to user activity. *See, e.g. OpenMind Solutions*, WL 4715200, at *1–2. (identifying internet service providers ("ISPs")); *In Keizankai*, 2022 WL 5122958, at *4 (identifying Google users). Finally, at least one remaining account is represented by counsel in this matter, who originally represented a collection of accounts under some kind of joint defense arrangement or in connection with a joint concern or entity. This further confirms these are tangible parties.

### 2.    There Are No Other Steps Available to Locate this Information.

Because the remaining accounts are anonymous or obscure user identities, and Applicant's civil action and other efforts in Mexico have failed to discover who operates them, the California Entities are the only place information is available. Ex. B, ¶ 26. Per this factor, a party seeking early discovery should identify all other previous efforts and steps to locate the other parties' identities. *OpenMind Solutions*, No. 11–3311, 2011 WL 4715200, at *3. Otherwise, Applicant cannot include the Anonymous Individuals—central figures in the defamation campaign at issue—in its civil lawsuit. *Zuru*, 614 F. Supp. 3d at 708 (Zuru's defamation claim, while plausible, almost surely won't make it off the ground without Glassdoor's help. Glassdoor knows who wrote the reviews, Zuru doesn't. And if Glassdoor doesn't identify the reviewers, Zuru can't sue them and will be left without a means by which to "vindicate [its] good name.")

To date, despite all efforts, Applicant has been unable to locate this information in Mexico. *Id.* at ¶ 27. Because the California Entities are located in California, no other method is available to obtain this information, or any other information described in the subpoenas as to which users sent the offending posts. *Id.* at ¶ 27. Consequently, for these reasons and because this Court has jurisdiction over the California Entities, this Application is the next and only option the Applicant has to find the Anonymous Individuals' information and proof that they sent the posts at issue.

Accounts for handles like @catrina_nortena, or Iber Alejandro, for example, include almost no identifying information. *Id.* at ¶ 28. Other accounts include limited information like certain first names or "geotags," which broadly indicate a town or neighborhood from which the account is posting. *Id.*

at ¶ 29. Furthermore, where the accounts at issue do include or list names, or depict live persons, it is unclear if the names are pseudonyms or who the individuals are. *Id.* at ¶ 30. The Applicant already attempted to secure this information by itself. Ex. C. at ¶ 36, 38.

Moreover, although related to the criminal investigation, for which Banco Azteca does not seek discovery here, the relevant legal authorities in Mexico made separate demands that the California Entities remove the offending posts and those efforts confirmed that information is only reachable in California. Ex. C, ¶¶ 13–18; *see also, e.g., seescandy.com*, 185 F.R.D. at 579 (describing other correspondence and calls to locate the identity of the elusive defendants prepared simultaneously with the plaintiff's motion for a temporary restraining order for trademark infringement).

Moreover, for example, when Applicant presented a cease-and-desist order to Meta's Mexican affiliate, it stated that any such inquires needed to be made directly to the U.S. entity because their offices lacked the ability to provide the requested information and the authority to remove the offending posts. *Id.* at ¶ 37. As to X, the order was unable to be delivered in Mexico. *Id.*

Accordingly, there is seemingly no other source from which Applicant may learn information regarding the Anonymous Individuals. Given the scale of the damages at issue, and the time and expense to date in this matter, Applicant has every incentive to locate that information, but has yet to succeed. The Applicant adequately demonstrates that it made other good faith efforts to identify the Anonymous Individuals and evidence that they circulated the posts at issue, and this Application is the logical and only next step to locate that information. There is no other place the Applicant can seek those data to support its civil case in Mexico. This factor accordingly weighs in favor of granting this Application.

3.    The Applicant's Suit Against the Defendants, Including the Anonymous Individuals, Could Withstand a Motion to Dismiss Under Mexican Law.

The facts alleged herein would be sufficient to withstand a Motion to Dismiss in this Court and under Mexican law. Under Book 4, Title One, Chapter V, of the Mexican Federal Civil Code, and precedents issued by Mexican federal courts, the posts at issue meet all the elements of defamation, as set forth in Mr. Luque's declaration. *See* Ex. D, ¶ 8.

As Mr. Luque states, each of the Anonymous Posters' actions meet these elements. As described herein, the Anonymous Individuals engaged in a concerted pattern of publishing repeated, knowingly false statements about Applicant's financial situation and falsely claiming that Applicant was bankrupt and not honoring deposits, which in turn, caused a run on the Applicant's bank causing millions of dollars in damage. The statements not only went to the heart of Applicant's business and its practices, thereby causing not just economic, but also reputational damages. Moreover, they involve direct calls to action or are designed to provoke as much, something that sits well without free speech laws in Mexico *or* the United States.

To the extent anyone responsible for the accounts at issue would dispute that they made these claims honestly or in good faith, or that their actions or statements caused the damages asserted, that is beyond any kind of motion to dismiss consideration and Applicant is entitled to at least litigate those facts in the underlying civil claim in Mexico. Courts in this Circuit assessing Section 1782 requests to support defamation claims can and will decline to determine the viability of those claims or the merits of elements like whether an opinion was honestly held or causation, which are better determined by the underlying tribunal. See, e.g. *Zuru*, 614 F. Supp. 3d at 704–708. Here Applicant asserts plausible claims for defamation under Mexican law that would survive a motion to dismiss. Ex. D, ¶¶ 8–9.

### 4. There Is a Reasonable Likelihood that Applicant Will Be Able to Identify and Serve the Anonymous Individuals Through this Discovery.

Sufficient legal authority exists where courts in this district previously granted parties' Section 1782 applications for similar reasons based on the simple circumstance that internet platforms require users to provide email addresses and other identifying information to create accounts. See, e.g. *In re Keizankai*, 2022 WL 5122958, at *1, 4 (granting a similar application to learn information associated with the account at issue like "names, addresses, email addresses, telephone numbers…and identifying access log information, such as IP addresses…"); *In re Frontier Co., Ltd.*, No. 19-mc-80184-LB, 2019 WL 3345348, at *1, 5 (granting application to subpoena network services provider for IP addresses, account information, and telephone, and address information of account holders); *In re Gianasso*, C 12-80029 MISC SI, 2012 WL 651647, at *2 (seeking account information of a user that posted on

Glassdoor.com); *Ex Parte Darmon*, 17-MC-80089-DMR, 2017 WL 3283969, at *2 (granting application to subpoena identifying account information for Wordpress.com users). Likewise, here the California Entities can produce the same information as to the Anonymous Individuals' identities and records that they sent the posts at issue. Accordingly, the Court should grant this Application.

### D. Applicant Remains Willing to Agree to Protective Measures to Safeguard and Limit the Information Sought for Only Proper Uses.

To further resolve the California Entities' concerns, Applicant is willing to entertain entering into reasonable protective agreements that may safeguard the information sought. These include assurances that Applicant will not disclose the information obtained in this proceeding other than for use in civil proceedings in Mexico. Applicant is also willing to discuss any reasonable limits proposed by the California Entities to narrow the scope of the subpoenas.

## VI. CONCLUSION

For the reasons stated above, the Applicant satisfies the statutory requirements of Section 1782 and the discretionary *Intel* and Ninth Circuit factors. In light of the twin aims of Section 1782 to provide efficient assistance to foreign litigants and to encourage foreign countries by example to provide similar assistance to U.S. courts, this Court should exercise its discretion to authorize discovery against X, Meta, and Google so that the Applicant can conduct limited discovery to identify the Anonymous Individuals and gather other evidence for use in its civil action in Mexico.

Dated: September 26, 2025

Respectfully submitted,

NELSON MULLINS RILEY & SCARBOROUGH LLP

By:      */s/ P. John Veysey*

Michael J. Hurvitz
P. John Veysey

Attorneys for Applicant
BANCO AZTECA S.A. INSTITUCIÓN DE
BANCA MÚLTIPLE